**Hettie TERRELL, Plaintiff,**

v.

**UNITED STATES of America,
Defendant.**

**Civ. A. No. CA–1–79–65.**

United States District Court,
N. D. Texas,
Abilene Division.

June 19, 1981.

Supplemental Opinion July 7, 1981.

Bob Roberts, Roberts & Weldon, Austin, Tex., Frank Scarborough, Abilene, Tex., for plaintiff.

Mary Ann Murphy, Trial Atty., Torts Branch, Civil Division, U. S. Dept. of Justice, Washington, D. C., Kenneth J. Mighell, U. S. Atty., Paula Mastropieri-Billingsley, Asst. U. S. Atty., Dallas, Tex., for defendant.

## MEMORANDUM OPINION

WOODWARD, Chief Judge.

Plaintiff brings this action against the defendant, United States of America, pursuant to the Federal Tort Claims Act, 28 U.S.C. § 1346(b), and § 2671, et seq., and the National Swine Influenza Immunization Program of 1976 (Swine Flu Act), 42 U.S.C. §§ 247b, et seq. This court has jurisdiction of the parties and subject matter and venue is properly in the Abilene Division of the Northern District of Texas in accordance with 28 U.S.C. § 1402(b).

This non-jury case was tried before the court on the 8th, 9th, and 10th days of June, 1981 with all counsel and parties present. After hearing and considering the pleadings, the evidence, the exhibits, and the briefs and arguments of counsel, the court files this memorandum opinion which shall constitute its findings of fact and conclusions of law. In addition to this memorandum the attached findings of fact and conclusions of law shall also be considered as a part hereof and the stipulations of the parties in the pre-trial order and those filed during the trial of the case shall also be considered as the findings of fact of this court where applicable.

A preponderance of the evidence establishes the following:

1. On Saturday, October 30, 1976, the plaintiff received a Bivalent Swine Flu inoculation at a public clinic conducted at the National Guard Armory in Abilene, Texas. This inoculation was administered by the County Health Department, a designated agency for the administration of same. This vaccine was administered pursuant to and in compliance with requisite standards.

2. On November 24, 1976, the day before Thanksgiving, the plaintiff drove a distance of forty-one miles, from her home in Sweetwater, Texas to Abilene, Texas. Plaintiff spent a portion of the Thanksgiving holidays with her son and daughter-in-law in Abilene. Earlier that week, the daughter-in-law had been ill with a gastrointestinal virus. The daughter-in-law's symptoms included fever, vomiting and general nausea.

3. On the day following Thanksgiving, plaintiff complained of and was suffering from tiredness. She slept later than usual on that day and appeared to be unsteady in her walk.

4. On Thursday, December 2, 1976, Mrs. Terrell became ill with a gastrointestinal viral infection and her symptoms were similar to those suffered by her daughter-in-law during the week of Thanksgiving. This illness occurred about four and one-half weeks after the Swine Flu inoculation.

5. One week later, on December 9, 1976, Mrs. Terrell experienced a moderately high fever and also experienced difficulty in getting out of bed and lifting objects.

6. On the following Saturday, December 11, 1976, Mrs. Terrell's daughter-in-law went to Sweetwater and found her mother-in-law to be ill with a high fever. The daughter-in-law returned to Abilene with Mrs. Terrell and took her to Hendricks Memorial Hospital.

Dr. Paul Mani, a urologist, admitted Mrs. Terrell to the hospital because her family physician could not be contacted. However, her family physician, Dr. Zane R. Travis, assumed care and treatment of Mrs. Terrell on December 13, 1976 and Mrs. Terrell has remained under his care. Upon Dr. Travis' request, Dr. Rexford Anderson saw the plaintiff as a consulting neurologist.

7. On Monday, December 13, 1976, while in the hospital, plaintiff had difficulty walking and would trip and fall when she would get out of the hospital bed. This

occurred about six weeks after the immunization, but only eleven days following her gastrointestinal virus.

8. Prior to this particular incident, Mrs. Terrell had a medical history of several operations including removal of a tumor from a kidney and a thyroidectomy. In addition, plaintiff had suffered from a duodenal ulcer. At the time Mrs. Terrell took the Swine Flu inoculation, she was seventy-three years old and in comparatively good health. Subsequent to these events, plaintiff underwent an operation for removal of bladder stones.

9. Mrs. Terrell remained in Hendricks Memorial Hospital for approximately three months. During her hospitalization, Mrs. Terrell's condition deteriorated to the point that she lapsed into a comatose state and lost all movement in her arms and legs. Her attending physician was unable to precisely diagnose her illness at this time. Plaintiff gradually improved, however, throughout January and February and she was moved to a nursing home on March 8, 1977. Upon her discharge from the hospital, Mrs. Terrell began therapy sessions at West Texas Rehabilitation Center. Plaintiff left the nursing home in April 1977 and went to stay with her son and daughter-in-law. In November 1977, plaintiff's condition had improved to the point that she could return to her home in Sweetwater. Mrs. Terrell has progressed from a bedridden condition to a walker, to crutches and now to a cane. She is presently able to drive a car but is unable to handle many of her household chores.

10. Upon discharge from Hendricks Memorial Hospital, the final diagnosis by Dr. Travis described her illness as encephalitis syndrome with quadriplegia. (Deft. E–3E). Similar diagnoses appeared on her discharge from the nursing home, (Deft. E–3F) and also on her records from West Texas Rehabilitation Center. (Deft. E–3G).

The discovery in the Multidistrict Litigation and in this particular case is voluminous. It is the position of the plaintiff that defendant's liability can be based upon the failure of the government to comply with the provisions of the Swine Flu Immunization Act in that it did not give the requisite notice to the public of possible side effects and that this is negligence per se. Further, plaintiff states that the government was negligent in commencing the vaccination rather than stockpiling the vaccine at the start of the program. Liability is also alleged under the theory of strict liability in tort in that the serum was unreasonably dangerous.

However, the real dispute in this litigation comes down to a determination of whether or not the Swine Flu serum administered to Mrs. Terrell on October 30, 1976 was a proximate cause or a producing cause of her illness. In making the determination, the following additional findings of fact are here made by the court:

11. Mrs. Terrell did not have the illness known as Guillain-Barre Syndrome (GBS).

12. The evidence establishes that Mrs. Terrell had a disease known as encephalomyelitis. The symptoms suffered by Mrs. Terrell and the course of her illness were not consistent with a diagnosis of GBS, a disease involving the peripheral nervous system. Instead, the diagnosis which the court accepts as being established by the evidence is that of encephalomyelitis, a disease in the central nervous system.

13. The preponderance of the evidence in this case establishes that the onset of the encephalomyelitis occurred at the time she was admitted to the hospital on December 11, 1976 or more probably on December 13, 1976. This is in accord with the testimony of her attending neurologist, Dr. Anderson, and with the other expert opinion in this case.

14. The plaintiff has failed to prove by a preponderance of the evidence that the disease known as encephalomyelitis may result from a vaccine under the Swine Flu Immunization Program. Although it has been well established that this inoculation may, in certain cases, result in GBS, the evidence in the case now before the court does not establish a causation by this inoculation of the disease suffered by Mrs. Terrell in the fall of 1976 and the early months of 1977.

15. The incidence of encephalomyelitis in the general population of the United States is not shown to have increased after the administration of the Swine Flu inoculation to approximately forty-five million people in the fall of 1976. (Deft. C–11). If anything, the statistical data shows a decrease in the occurrence of encephalomyelitis following the inoculation, which is proof that the immunization did not cause the illness.

16. While there is evidence that other vaccines such as smallpox and rabies may result in the neurological disorder known as encephalomyelitis, the onset of this illness will usually take place within one to three weeks of the immunization. While there is no evidence that a Swine Flu inoculation would result in encephalomyelitis, the disease that Mrs. Terrell had occurred approximately six weeks after the inoculation.

17. Encephalomyelitis can result from a viral infection although this is by no means the only cause of this disease. The evidence establishes that the onset of encephalomyelitis will usually be within one to three weeks of the virus.

18. The preponderance of the evidence in this case establishes that Mrs. Terrell's illness was caused, not by the inoculation, but by an intervening gastrointestinal infection. The viral infection that Mrs. Terrell had on December 2, 1976 occurred approximately ten days prior to the onset of encephalomyelitis in her case.

The defendant has asserted that there was a voluntary and knowing consent given by Mrs. Terrell to this inoculation with full knowledge on her part of the dangerous side effects. An informed consent form was signed by her. (Deft. E–4). However, it is not necessary for this court to determine whether or not such consent bars any recovery on her part as the element of causation is completely lacking in this case and this is sufficient to deny recovery and for entry of a judgment on behalf of the government.

Therefore, judgment will be entered that plaintiff take nothing and that costs be assessed against the plaintiff.

## ADDITIONAL FINDINGS OF FACT AND CONCLUSIONS OF LAW

### FINDINGS OF FACT

1. On August 12, 1976, President Gerald Ford signed into law S. 3735 (PL 94–380), "The National Swine Flu Immunization Program of 1976."

2. Swine flu inoculations began pursuant to the Act on October 1, 1976.

3. On October 30, 1976, plaintiff signed an informed consent form requesting a swine flu vaccination. Pursuant to that request, plaintiff received a bivalent Swine Flu inoculation during a vaccination clinic conducted at the National Guard Armory, Abilene, Texas, by a designated agency for the administration of the Swine Flu Immunization Program.

4. At the time of her vaccination, plaintiff was seventy-three years of age.

5. Prior to her vaccination, plaintiff had several operations, including a hysterectomy, gastrectomy, thyroidectomy, and cholecystectomy. In addition to cancer of the thyroid, plaintiff had a duodenal ulcer, hypertension, and a deformity of the superior pole of the left kidney. More recent physical examinations have revealed arteriosclerotic heart disease and degenerative arthritis of the lower back and both hips.

6. On December 11, 1976, plaintiff was admitted to Hendrick Memorial Hospital by plaintiff's urologist, Dr. Mani, with a two day history of chills, fever, and left flank pain.

7. Plaintiff's family internist, Dr. Zane Travis, recorded in his progress notes of December 13, 1976, that on Friday, November 27, plaintiff had visited her daughter-in-law, who had a gastrointestinal virus. Dr. Travis reported that plaintiff developed the same symptoms five days later, on the next Wednesday, December 1, 1976. The doctor's notes reveal that the following week, which was the week prior to plaintiff's hospital admission, plaintiff developed a fever. The day she was admitted, plain-

tiff's temperature was 103. Plaintiff did not have any respiratory or gastrointestinal symptoms during the week of her admission, other than some vomiting on Friday, December 10, 1976.

8. In his consultation record of December 17, 1976, Dr. Travis again reported that plaintiff visited her daughter-in-law on November 27, 1976, who had an acute GI virus. The patient developed the same symptoms during the following week (5 days later). Dr. Travis likewise reported "during the past week, the patient has developed fever and her temperature was 103 degrees this past Saturday morning." Dr. Travis' consultation record notes that plaintiff's daughter-in-law denied plaintiff had had any respiratory or GI symptoms the week of her admission, other than some vomiting on that Friday.

9. Plaintiff continued to have fever and increasing somnolence. By December 15, 1976, Dr. Travis' impression was that plaintiff had viral encephalitis. According to Dr. Travis, the results of a spinal tap on that date were compatible with a typical non-bacterial encephalitis. Dr. Travis recorded plaintiff's opening pressure of the lumbar puncture as elevated at 268 mm of water. The protein level of the spinal fluid was elevated at 76. The lumbar puncture was described as atraumatic, but 37 fresh red blood cells were found in the spinal fluid. In addition, 10 lymphocytes were also found in the fluid. Expert testimony consistently interpreted these findings as objective signs of a central nervous system disorder.

10. On December 18, 1976, Dr. Rexford Anderson, a neurologist, saw plaintiff in consultation at the request of Dr. Travis. Dr. Anderson's neurological examination of plaintiff on that date revealed objective signs of a central nervous system disorder, including markedly hyperactive reflexes, a positive Babinski sign, generalized disturbance on an electroencephalogram, a failure to even blink in response to threatening stimuli from the left, sluggish doll's eyes with an inability to get the left eye out laterally, and plaintiff's being comatose.

11. Dr. Anderson's examination on December 19, 1976, confirmed the signs of central nervous system problems, including bilateral positive Babinski's.

12. Although plaintiff began to improve by December 20, 1976, both Dr. Anderson and Dr. Travis noted on December 21, and 22, 1976, that plaintiff continued to be hyperreflexic and to have positive Babinski signs.

13. On December 24, 1976, Dr. Travis noted that plaintiff's condition was behaving more and more like encephalitis. A repeat lumbar puncture was performed. The opening pressure was no longer elevated, the protein in plaintiff's spinal fluid had decreased to 67, and the lumphocyte count had increased to 33.

14. On December 27, 1976, plaintiff was examined by Dr. Ferguson, an associate of Dr. Travis. Dr. Ferguson found some of plaintiff's reflexes were hyperactive, and found a positive Babinski sign. Dr. Ferguson performed tests to determine whether plaintiff's sensory signs were impaired, and found her sensation to pin prick, pain, touch, and cold all were intact. Dr. Ferguson's note of December 28, 1976, indicates that he, too, had made a working diagnosis of encephalitis.

15. When Dr. Anderson saw plaintiff on December 29, 1976, he noted that she had definitely improved. He still found a positive Babinski sign, and noted that plaintiff's recent lumbar puncture indicated plaintiff had encephalitis. Plaintiff continued to make very slow improvement through the first week in January 1977, although plaintiff still had no movement in her legs by January 7, 1977.

16. By January 15, 1977, plaintiff was definitely improving, and she was able to move her arms, legs, and feet. Plaintiff's progress notes reflect continuing increments of strength, with occasional set backs from urinary tract infections.

17. On February 1, 1977, Dr. Travis noted that plaintiff was still incontinent. She regained movement on her left side more quickly than on the right. Plaintiff tolerat-

ed steroid withdrawal well, and was discharged from the hospital on March 8, 1977. She was transferred to Happy Haven Nursing Home, where she remained until April 5, 1977.

18. Plaintiff was seen by at least six doctors during her hospitalization. Plaintiff's medical records of her 1976–77 illness contain no diagnosis by any doctor of Guillain-Barre Syndrome. The single mention of that disorder in all those medical records appears after Dr. Travis' December 24, 1976, progress note, which states "could also be atypical Guillain-Barre."

19. Dr. Travis' discharge diagnosis of March 8, 1977, was "encephalitis syndrome with Quadriplegia, slowly resolving."

20. Dr. Travis' final diagnosis of April 5, 1977, was "Encephalitis Syndrome Severe w/Quadriplegia."

21. On March 28, 1978, Dr. Travis' office notes include for the first time a diagnosis of "Guillain-Barre Syndrome."

22. On May 2, 1978, plaintiff filed an administrative claim for $150,000.00, asserting that she "contracted Guillain-Barre Syndrome following receipt of the Swine Flu vaccination."

23. Plaintiff's treating neurologist, Dr. Anderson, has never made a diagnosis of Guillain-Barre Syndrome, and is of the opinion that plaintiff had a central nervous system disorder, not a peripheral nervous system disorder like Guillain-Barre Syndrome.

24. Plaintiff's expert neurologist is Dr. William Sheramata, a neuroimmunoligist and Associate Professor of Neurology and Microbiology at the University of Miami.

25. The criteria of the National Institute of Neurological and Communicative Diseases and Stroke are generally accepted in the medical profession as valid and accurate criteria for the diagnosis of Guillain-Barre Syndrome. All expert neurologists in this case accept these criteria as valid and accurate.

26. The Guillain-Barre Syndrome is a disorder of the peripheral nervous system.

27. There is no biochemical test for the diagnosis of Guillain-Barre Syndrome. It is a descriptive term.

28. The Guillain-Barre Syndrome has been associated temporally with at least one hundred cases or events.

29. There is no biochemical or clinical test which can establish the cause of a particular case of the Guillain-Barre Syndrome.

30. Plaintiff's symptoms, signs, and laboratory test results were compatible with a diagnosis of a central nervous system disorder, not a peripheral nervous system disorder.

31. Plaintiff did not have Guillain-Barre Syndrome.

32. Epidemiology is a science involving study of the incidence of disease in populations. Epidemiological evidence is critical in discovering the etiology, or cause of diseases, particularly those which may have numerous causes.

33. In connection with the Swine Flu Immunization Program, and following the termination of the program, there was extensive surveillance of reported adverse reactions, and extensive epidemiological study.

34. The epidemiological study established that, compared to the unvaccinated population, the vaccinated population had a higher risk of Guillain-Barre Syndrome with onset of neurological symptoms within a few weeks following inoculation.

35. No similar relationship was found with respect to any other serious disease or disorder, including any other disease or disorder of the peripheral nervous system or of the central nervous system. Specifically, the Center for Disease Control surveillance showed no increased incidence of encephalitis or encephalomyelitis in swine influenza vaccine recipients.

36. In 1976, there were six case reports in the literature of encephalitis or encephalomyelitis which followed influenza vaccinations. Dr. Sheramata testified that postvaccinal encephalomyelitis occurs within three weeks of vaccination.

37. Plaintiff did not have post-vaccinal encephalomyelitis caused by the swine influenza vaccine.

38. All Dr. Travis' reports, including his most recent October 1979 report, reflect that plaintiff picked up a gastrointestinal, flu-like virus from her daughter-in-law, Gene Terrell, during a visit on November 27, 1976.

39. Plaintiff did have an intervening viral-type illness the first week in December 1976, as is reflected in her medical records.

40. Plaintiff's expert, Dr. Sheramata testified that if plaintiff had an intervening viral-type illness between the swine flu shot and her hospitalization, the intervening illness would be the most likely cause of a post-infectious encephalomyelitis, unrelated to the shot.

41. Plaintiff's treating neurologist, Dr. Anderson, testified that the course of her illness was also compatible with viral encephalitis, unrelated to the swine influenza shot.

42. Plaintiff's neurological illness was not caused by the swine influenza vaccine.

43. The swine flu vaccination did not contribute to, or aggravate, the injuries of plaintiff.

44. No negligent or wrongful act or omission of the United States, its agencies or employees, or a program participant, was a proximate cause of the injuries of plaintiff.

### CONCLUSIONS OF LAW

1. This Court's jurisdiction is based on the Federal Tort Claims Act, 28 U.S.C. §§ 2671, *et seq.* and the National Swine Influenza Immunization Program of 1976, 42 U.S.C. § 247b. Venue is proper in this district.

2. The applicable substantive law is that of the State of Texas.

3. The burden of proof in Texas requires the plaintiff to prove each element of her claim by a preponderance of the evidence.

4. The United States is not liable to plaintiff in this action, because the injuries of plaintiff were not Guillain-Barre Syndrome, were not the result of a swine flue vaccination, and were not proximately caused by a negligent or wrongful act or omission of the United States, its agencies, employees, or program participants.

5. The United States is not liable to plaintiff under any theory of liability.

6. A judgment will be entered that plaintiff take nothing and that costs be assessed against the plaintiff.