In re **SWINE FLU IMMUNIZATION PRODUCTS LIABILITY LITIGATION.**

**Dorothy Jean MONTOYA, Plaintiff,**

v.

**UNITED STATES of America, Defendant.**

**Civ. A. No. 79–F–1714.**

United States District Court, D. Colorado.

Nov. 19, 1981.

Stephen N. Berkowitz, Lutz & Berkowitz and Gary Lozow, Lozow & Lozow, Denver, Colo., for plaintiff.

Jeffrey Axelrad, Director, Torts Branch, Civil Division, U. S. Dept. of Justice, Washington, D. C., Joseph F. Dolan, U. S. Atty., D. Colo., William C. Danks, Asst. U. S. Atty., Denver, Colo., for defendant.

## MEMORANDUM OPINION AND ORDER

SHERMAN G. FINESILVER, District Judge:

Plaintiff, Dorothy Jean Montoya, brings this action against the United States of America alleging she contracted amyotrophic lateral sclerosis ("ALS")[1] as a direct result of her swine flu inoculation.

This suit is brought under the Federal Tort Claims Act ("FTCA"), 28 U.S.C. §§ 1346(b), 2671 et seq.[2] Mrs. Montoya claims that she developed ALS within one month after her swine flu shot, and that said shot was the proximate cause of her illness. The government admits that Mrs. Montoya has ALS but denies that her condition was caused by the swine flu vaccine. Additionally, the government contends, assuming Mrs. Montoya can prove causation, that she can establish no theory of liability on which to recover.

Mrs. Montoya has the burden of proving by a preponderance of the evidence that her ALS was proximately caused by the swine flu vaccine. For the reasons set out below, we find that she has not met this burden of proof and is not entitled to recover against the United States.

---

1. Amyotrophic lateral sclerosis is described in detail in section II of this opinion. ALS is referred to as "Lou Gehrig's Disease."

2. The National Swine Flu Immunization Program of 1976 (Swine Flu Act), 42 U.S.C. § 247b(j)–(*l*), establishes the FTCA as the vehicle for asserting claims against the United States of America arising out of the swine flu program. The following cases deal with the Swine Flu Act and related litigation:
*Hunt v. United States, Hollar v. United States,* 636 F.2d 580 (D.C.Cir.1980); *Sparkes v. Wyeth Laboratories,* 431 F.Supp. 411 (W.D.Okl.), *aff'd* per curiam, No. 77–1407 (10th Cir. 1978) (unpublished opinion); *Alvarez v. United States,* 495 F.Supp. 1188 (D.Colo.1980); *Hixenbaugh v. United States,* 506 F.Supp. 461 (N.D.Ohio 1980); *Heyman v. United States,* 506 F.Supp. 1145 (S.D.Fla.1981); *Lima v. United States,* 508 F.Supp. 897 (D.Colo.1981); *Gicas v. United States,* 508 F.Supp. 217 (E.D.Wis.1981); *Funston v. United States,* 513 F.Supp. 1000 (M.D.Pa.1981); *Terrell v. United States,* 517 F.Supp. 374 (N.D.Tex.1981); *Migliorini v. United States,* 521 F.Supp. 1210 (M.D.Fla.1981).

The following reflect our findings and conclusions on the issue of causation. Since Mrs. Montoya has not proven that her ALS was caused by the swine flu vaccine, we need not reach the question of liability.

## I.

## BACKGROUND

Dorothy Montoya is a thirty-two year old resident of Denver, Colorado. She was twenty-seven when she received a swine flu inoculation on November 17, 1976. Prior to this time, the only significant medical event in her past was a bout with rheumatic fever when she was twelve years old.

Mrs. Montoya teaches children with learning disabilities at Columbian Elementary School in Denver. She has received a bachelors degree in elementary education and a masters degree in learning disabilities. She taught educable mentally retarded children for three years.

Mrs. Montoya was working at Columbian Elementary School in November, 1976. She testified that there were several reasons for her decision to get a swine flu shot. She had recently separated from her husband and needed to continue working to support a young child. She was also concerned that her son could not be immunized and felt that she would not take the risk of her getting the flu and passing it to him.

She received her swine flu shot on November 17, 1976 at Skinner Junior High School, also in Denver. Almost immediately following her shot, Mrs. Montoya began to feel numbness in her left arm, which was the arm she had been inoculated in.

That same evening, Mrs. Montoya's left arm became more numb and she developed a fever. She described her arm as very sore with a tingling throughout. By November 18, 1976 her arm was red and puffy. For the next several days, Mrs. Montoya attempted to contact a nurse or other public health official to report her symptoms. She was told that her problem sounded like a normal reaction to an injection.

Mrs. Montoya testified that the numbness got worse for several days. She noticed that she had trouble performing simple tasks, such as lifting her son or dressing. Additionally, she has had to sit out of some of the activities she normally participated in with her students. She remembered that on Thanksgiving, some eight days later, she needed assistance cutting her food.

The numbness disappeared by December, 1976, but Mrs. Montoya continued to have problems with her left arm. She complained that her arm was getting weaker. She noticed that she was dropping things and needed two hands to do her work.

She developed a serious case of flu on about December 13, 1976. These symptoms lasted for nearly ten weeks. She attributed her continued weakness to this flu.

In February, 1977 Mrs. Montoya's left hand, and particularly the index finger on that hand, became functionally paralyzed. She mentioned this to her family physician, Dr. Weiss, but no diagnosis or cause was determined. Because of personal and financial problems, Mrs. Montoya did not return to a doctor until May, 1977.

By May, 1977 her left index finger was totally paralyzed. Mrs. Montoya again consulted Dr. Weiss. He noted that her entire left arm was much thinner than the right arm. He felt she looked very sick and had her admitted to St. Anthony's Central Hospital several days later.

At St. Anthony's Central, Mrs. Montoya was examined by Dr. Eric Hammerberg, a neurologist. His impression was that she was experiencing muscle atrophy in her left upper extremity, possibly related to spinal muscular atrophy or ALS. She was discharged from the hospital five days later.

Over the next several months, Mrs. Montoya was seen and examined by various doctors at the University of Colorado Medical Center. During this time she noticed that other fingers on her left hand were losing a great deal of movement. Her arm got progressively weaker and she had greater difficulty carrying and holding objects in her left hand.

Mrs. Montoya was hospitalized again in November, 1977. Again, she was examined by numerous doctors. No specific diagnosis was made, but she was told that her problem might be related to muscular dystrophy or deterioration of her spinal cord.

She continued to get progressively worse after being discharged from the hospital in November, 1977. By the end of 1978 her left arm was "withered away" and totally useless. She continued to work with the assistance of a full-time teacher's aide. By this time she had cut down almost all of her recreational activity. She visited the Mayo Clinic but was unable to get a definite diagnosis of her condition. She eventually was unable even to complete the physical therapy designed to help her left arm.

In January, 1980 Mrs. Montoya noticed that the ring on her right hand felt loose, and that the entire arm looked thin. She began experiencing progressive weakness in that arm as well. Electromyography studies ("EMG") performed in June, 1980 revealed that she had definite muscle weakness in both her right arm and in her left leg. It was after these test results that Dr. Hammerberg first diagnosed her condition as an ALS-type syndrome.

Since 1980 Mrs. Montoya's illness has slowly progressed. In early 1981 she fell at school and at home. Her legs gave out on her while shopping at the Northglenn Mall and she had to be taken to the hospital. She had particular trouble on stairs.

At trial, Mrs. Montoya testified that she is presently unable to dress without help, cannot cut her own food or lift a glass to drink, requires help in the physical care of her son, and engages in no physical recreational activities. While she continues to teach at Columbian Elementary School, she does not feel that she can continue for too much longer. Her desire that the students get the best possible education may cause her to leave teaching.

Considering the nature of ALS, Mrs. Montoya's prognosis is questionable. She continues to suffer the effects of her illness as evidenced in her physical condition and difficulty in mobility.

## II.

### MALADY INVOLVED

Mrs. Montoya is suffering from a rare disease known as amyotrophic lateral sclerosis. ALS is a degenerative motor neuron disease characterized by impaired speaking, swallowing and breathing, progressive muscle weakness, and spasticity. The eventual result is total paralysis. Mulder, ed., *The Diagnosis and Treatment of Amyotrophic Lateral Sclerosis*, (Houghton Mifflin, Boston 1979); Amico and Antel, *Amyotrophic Lateral Sclerosis*, 70 Postgraduate Medicine 50 (August, 1981).

Motor neurons are nerve cells that control muscle function. They are present in the brain and the brain stem [called "upper motor neurons"], and in the spinal cord [called "lower motor neurons"]. The clinical picture of ALS depends on the degree and combination of upper and lower motor neuron involvement. (Testimony of Dr. Stuart A. Schneck); Mulder, *supra.*

The loss of upper motor neurons[3] will manifest itself as motor weakness, increased muscle tone (spasticity), increased reflexes, and occasionally Babinski's signs.[4] The loss of lower motor neurons is characterized by muscle weakness, atrophy, and reduction or loss of deep tendon reflexes. Additionally, muscle cramps and fasciculations (muscle twitching) are often associated with lower motor neuron involvement. Mulder, *supra.*; Amico and Antel, *supra.* Both upper and lower motor neuron involvement are required for an accurate diagnosis of ALS. (Testimony of Dr. Eric Hammerberg).

As a syndrome affecting both the upper and lower motor neurons, ALS is character-

---

3. This is caused by the deterioration of the nerve pathways between the brain and the spinal cord. (Testimony of Dr. Schneck).

4. Refers to extensor plantar [sole of foot] reflexes that appear with lesions of the medulla oblongata—the lower part of the brain stem.

ized by progressive, asymmetric muscle weakness and wasting. While one limb may be initially affected, the disease spreads to all extremities and the torso. As a result, any long-term prognosis is extremely poor. Mulder, *supra.*

There is rarely a loss of occular movement or bladder control associated with ALS. *Id.* However, bladder incontinence may be caused by the weakening of the abdominal muscles. *Id.* The vocal cord may become paralyzed in advanced cases. *Id.*

Although numerous causes have been speculated upon, the exact etiology of ALS remains unknown. For a long time, the prominent view was that ALS was related to a virus or viral infection. *See* Mulder, *supra.*; Muller and Achaltenbrand, *Attempts to Reproduce Amyotrophic Lateral Sclerosis in Laboratory Animals by Inoculation of Schu Virus From a Patient With Apparent Amyotrophic Lateral Sclerosis,* 220 Journal of Neurology 1 (1979); Kascsak et al., *Antibody Response to Arboviruses,* 35 Archives of Neurology 440 (July, 1978); Oshiro et al., *Viruslike Particles in Muscle From a Patient With Amyotrophic Lateral Sclerosis,* 26 Neurology 57 (January, 1976); Pena, *Viruslike Particles in Amyotrophic Lateral Sclerosis: Electron Microscopical Study of a Case,* 1 Annals of Neurology 290 (1977). To date, efforts to isolate and culture a virus have been unsuccessful. Mulder, *supra.*

Other suspected causes include: tumor formation, Massey and Riley, *Neurological Manifestations of Malignancies,* 146 Military Medicine 178 (March, 1981); mechanical injury or surgery, Kondo and Tsubaki, *Case-Control Studies of Motor Neuron Disease,* 38 Archives of Neurology 220 (April, 1981); and auto-immune response to a foreign antigen, Gilroy and Mayer, *Medical Neurology,* p. 209 (Macmillan Publishing Co., New York 1979), Mulder, *supra.* Like virus, these etiologies remain unsubstantiated.

### III.

### MEDICAL TESTIMONY

It is agreed that Mrs. Montoya suffers from ALS. Thus, the critical issue is whether the swine flu vaccination she received on November 17, 1976 was the causative factor. The following experts testified at trial with regard to this issue: Eric Hammerberg, M.D., and Stuart A. Schneck, M.D.

Dr. Hammerberg is an Assistant Professor of Neurology at the University of Colorado Medical Center, and a practicing clinical neurologist. He first examined Mrs. Montoya on May 16, 1977 after she entered St. Anthony's Central Hospital. At this time, Mrs. Montoya told him that she experienced weakness in her upper left arm for the previous two months. He was not aware that she had complained of weakness and numbness beginning immediately after she received the swine flu shot.

After this examination, Dr. Hammerberg felt Mrs. Montoya was suffering from a localized spinal muscle atrophy relating to a loss of anterior horn cells in the region of the left brachial plexus.[5] He did not believe the swine flu shot was the cause of this problem. While he considered a diagnosis of ALS, Dr. Hammerberg testified that ALS is a diagnosis not easily made given the very serious prognosis.

Over the next one and one-half years, Dr. Hammerberg referred Mrs. Montoya to other neurologists and muscle specialists in an effort to diagnose and treat her gradually worsening condition. All of the doctors basically agreed that she was suffering from some form of atrophic disease. However, a specific diagnosis of ALS was never made.

As he reviewed the reports of these other doctors, Dr. Hammerberg became aware of more of Mrs. Montoya's medical history immediately following the swine flu shot. He learned for the first time that she had

---

5. Anterior horn cells are neurons on the spinal cord which send nerve fibers to supply muscles in the extremities. The loss of these cells causes denervation, and the resultant loss of function, of those muscles.

experienced numbness and weakness continuously from the time she received the shot. Additionally, Dr. Hammerberg found it significant that these symptoms began in the arm in which she received the shot.

In December, 1978, Dr. Hammerberg first discussed with Mrs. Montoya the possibility that her illness was related to the swine flu vaccine. His opinion was supported when he attended a convention of the American Academy of Neurology. He discussed Mrs. Montoya's case with other neurologists and found that several had seen cases of ALS following the swine flu program. One nationally-recognized expert on ALS, Dr. Forbes H. Norris, told Dr. Hammerberg that he had seen four or five such cases.[6]

Dr. Hammerberg did not diagnosis Mrs. Montoya's condition as ALS until he was certain she had both upper and lower motor neuron involvement. EMG studies conducted in June, 1980 revealed denervation plus increased reflexes in her left leg. He testified that increased reflexes are a sign of upper motor neuron deterioration.

Dr. Hammerberg based his opinion that Mrs. Montoya's ALS was caused by the swine flu shot she received on four factors. First, the temporal relation between the shot and the onset of the numbness and weakness. Second, that these symptoms began in the arm in which she received the shot. Third, the fact that these symptoms began immediately after the shot and never went away. Fourth, that women Mrs. Montoya's age rarely contract ALS. Dr. Hammerberg testified that these factors, taken together, build too compelling a case for causation to be dismissed as mere coincidence.

Dr. Hammerberg was questioned extensively on the absence of any reported case or commentary suggesting a relationship between ALS and an immunization. It was Dr. Hammerberg's opinion that this void of information does not disprove causation. He stated that there are many reasons why cases do not get reported in the medical literature. He felt the primary reason was because most medical journals are reluctant to accept single case reports, particularly without some objective supporting data. This, in turn, makes doctors hesitant to report.

Dr. Hammerberg was shown an epidemiological study completed in Rochester, Minnesota between 1925 and 1977 which did not show an increased incidence of ALS following the swine flu program in 1976. *See* Juergens et al., *ALS in Rochester, Minnesota, 1925–1977*, 30 Neurology 463 (May, 1980). He stated that this study does not prove or disprove an increased incidence of ALS following the swine flu program because there were no follow-up studies done. He felt that most ALS that developed in late 1976 and early 1977 would not be diagnosed before the study was completed.

In sum, Dr. Hammerberg concluded that, given the young age of Mrs. Montoya, the rapid onset of symptoms in her left arm, the unbroken progression of numbness and weakness, and the temporal relation between the shot and these symptoms, the swine flu vaccination Mrs. Montoya received was the most probable cause of her ALS.

Dr. Schneck is a Professor of Neurology and Neuropathology at the University of Colorado Medical Center. Mrs. Montoya was referred to him by Dr. Hammerberg on November 29, 1977. At this examination, Dr. Schneck found that Mrs. Montoya's left arm muscles were weak and she had no deep tendon reflexes in that arm. The reflexes in her right arm and both legs were slightly increased. He felt this was some evidence of upper and lower motor neuron involvement.

Dr. Schneck also examined Mrs. Montoya on August 19, 1981 at the request of the government. At this time he found her entire left arm to be markedly atrophic. The same was true to a lesser degree of her right arm. He also found weakness in the muscles of her hips and in her left foot. He described her left foot as almost "frail".

Dr. Schneck concluded that Mrs. Montoya had a very severe degree of muscle weak-

---

6. Testimony indicated that, while Dr. Norris saw these cases, he neither reported them in any medical journal nor causally related them to the swine flu vaccine.

ness in all four extremities. He felt the combination of upper and lower motor neuron signs was indicative of ALS. He testified that this was especially true in the absence of objective sensory findings. Except in the rare "familial" cases of ALS, there are no objective findings of sensory abnormalities. *See* Mulder, *supra.*, pp. 60–61.

Dr. Schneck discounted the significance of Mrs. Montoya's sensory symptoms (numbness and weakness) following the swine flu shot. He stated that he had heard of similar complaints from other patients who had received the inoculation. As many of thirty or forty percent of all vaccinees reported similar localized symptoms.

In Dr. Schneck's opinion, Mrs. Montoya's ALS was not caused by the swine flu vaccine. He gave several reasons for this opinion. First, the normal incidence of ALS in the United States is approximately one or two per one hundred thousand persons. If the swine flu vaccine was capable of causing ALS, an increased incidence should have been apparent in the year or so following the program. He stated that he found no evidence of any increased incidence. He conferred with other doctors and researchers at the Amytrophic Lateral Sclerosis Society of America in Sherman Oaks, California. No one had encountered an increase in the reported cases of ALS. Based on the national average, Dr. Schneck felt that some people would develop ALS at a time subsequent to receiving a swine flu vaccination.

Second, the etiology of ALS is unknown. Dr. Schneck stated that many possible causes have been considered, including: a virus, an auto-immune reaction, cancer, trauma, and certain toxins, such as lead. None of these have been proven to be the cause of ALS. Therefore, Dr. Schneck concluded, you cannot say that ALS can be caused by the swine flu vaccine. He added that many doctors recommend influenza vaccinations for their ALS patients.

As with any of the suspected causes of ALS, Dr. Schneck stated that it was possible for the swine flu vaccine to cause ALS, but certainly not probable. Without further evidence and without objective data, he felt you could not make the medical inference that Mrs. Montoya's ALS was caused by the vaccine. In his view, it was coincidental that her ALS followed her swine flu immunization.

## IV.

### CAUSATION

Mrs. Montoya received her swine flu shot in Denver, Colorado. Therefore, the law of Colorado on causation applies in this case. *See* 28 U.S.C. § 1346(b).

■ Under Colorado law, a plaintiff has the burden to prove by a preponderance of the evidence that the swine flu vaccine was the proximate cause of their injury. *Exchange National Bank of Colorado Springs v. Sparkman*, 191 Colo. 534, 554 P.2d 1090 (1976). Mere speculation or conjecture will not establish a probability. *O'Connor v. Boulder, Colorado Sanitarium Association*, 107 Colo. 290, 111 P.2d 633 (1941); *also Alvarez v. United States*, 495 F.Supp. 1188 (D.Colo.1980).

Mrs. Montoya has introduced no persuasive evidence that the swine flu vaccine can cause ALS. She endeavored to prove causation by circumstantial evidence, the most significant of which was the temporal relation between the shot and the onset of her symptoms.

■ Mrs. Montoya contends that the temporal relationship, along with other circumstantial evidence, supports causation attributable to the vaccine. However, no medical literature, case history, or commentary lends credence to this view. Mere temporal relationship is not sufficient to establish causation. *Bean v. United States*, 533 F.Supp. 567 (D.Colo.1980).

■ There is a conflict in expert testimony on two essential points. First, whether Mrs. Montoya's early symptoms of numbness and weakness were related to her ALS. Second, whether her ALS was caused by the swine flu shot. As the trier of fact, it is within our province to give added weight to that opinion we feel is based on the more

sound and persuasive reasoning and experience. In this case, the testimony and opinion of Dr. Schneck more accurately reflected the actual state of events surrounding Mrs. Montoya's illness and the current posture of medical knowledge.

There is no doubt that the opinion of Dr. Hammerberg is based on his sincere medical judgment. He found it compelling that Mrs. Montoya should begin to suffer weakness immediately after her vaccination, in the arm in which she received the shot, and that those symptoms continued until the time she was diagnosed as having ALS.

We are persuaded, however, by the testimony of Dr. Schneck that nearly forty percent of all swine flu vaccinees reported similar symptoms following their shots. Additionally, both Dr. Schneck and the Mulder treatise (Mulder, ed., *Diagnosis and Treatment of Amyotrophic Lateral Sclerosis, supra*) state that sensory signs, such as numbness, are not associated with the onset of ALS.

We agree that it is possible that the swine flu vaccine, or any vaccine for that matter, could cause ALS. A possibility is not sufficient to establish causation. Without some objective evidence, an increased incidence of ALS following the swine flu program, or medical commentary reporting a causal connection between ALS and the swine flu vaccine, that possibility is no more than speculation or conjecture.

Mrs. Montoya had the burden to prove by a preponderance of the evidence that her ALS was proximately caused by the swine flu vaccination she received on November 17, 1976. Without more than speculation, buttressed only by a temporal relationship, she has not met that burden. As a result, she is not entitled to recover against the United States government.

## V.

### CONCLUSION

This is a difficult heart rendering case. Our sympathies are with Mrs. Montoya. She is suffering from an illness which threatens to curtail a brilliant career devoted to the betterment of youth. While her plight is distressing, Mrs. Montoya has met her illness with courage and perseverance. Unfortunately, medical science has not advanced to a point where the causes of ALS are understood.

Under the Federal Tort Claims Act, and the Swine Flu Act, the government is liable only for those injuries proximately caused by the swine flu vaccine. Without more objective proof than was produced by Mrs. Montoya, she cannot be found to have established that causation.

Counsel in this case are commended. Stephen N. Berkowitz, Esq. and Gary Lozow, Esq. exhibited the highest degree of preparation, skill, and dedication of purpose in the representation of Mrs. Montoya. William C. Danks, Esq., Assistant United States Attorney for the District of Colorado, performed with the professionalism required of his office in the representation of the government's case.

### ORDER

For the reasons above, we find in favor of the defendant, United States of America, and against the plaintiff, Dorothy Jean Montoya. The Clerk of the Court is directed to enter judgment in favor of defendant and against plaintiff, and the complaint and action are dismissed. Each party to pay its or her own costs.