**In re SWINE FLU IMMUNIZATION PRODUCTS LIABILITY LITIGATION.**

**Verlin G. UNTHANK, Plaintiff,**

v.

**UNITED STATES of America, Defendant.**

Civ. A. No. 78–F–452.

United States District Court, D. Utah.

Jan. 4, 1982.

Clark W. Sessions, and Duane R. Smith, Sessions, Moore & Smith, Salt Lake City, Utah, for plaintiff Verlin G. Unthank.

Jeffrey Axelrad, Director, Torts Branch, U. S. Dept. of Justice, Emilia DeMeo, Trial Atty., Torts Branch, U. S. Dept. of Justice, Washington, D. C., Ronald L. Rencher, U. S. Atty., D. Utah, and Lawrence J. Leigh, Asst. U. S. Atty., D. Utah, Salt Lake City, Utah, for defendant United States of America.

## MEMORANDUM OPINION AND ORDER

SHERMAN G. FINESILVER, District Judge: [1]

Plaintiff Verlin G. Unthank claims that her neurological illness, transverse myelitis, resulted from the National Swine Flu Immunization Program of 1976. Further, she alleges that the defendant United States of America, sponsor of the program, is liable for damages.

In this suit, brought under the Federal Tort Claims Act ("FTCA"), 28 U.S.C. §§ 1346(b), 2671 et seq.,[2] plaintiff seeks recovery based on theories of negligence, strict liability and failure to warn her fully of the risks and benefits of the vaccine used in the immunization program. The government denied liability and contends there· is no causal relation between the vaccination and Mrs. Unthank's condition. Additional-

[1]. United States District Court for the District of Colorado, sitting by designation.

[2]. The Swine Flu Act establishes the FTCA as the vehicle for asserting claims against the United States government arising out of the swine flu program. For a discussion of the Swine Flu Act see Alvarez v. United States, 495 F.Supp. 1188 (D.Colo.1980).
The following cases deal with the Swine Flu Act and related litigation:
Hunt v. United States, Holler v. United States, 636 F.2d 580 (D.C.Cir.1980) (non-applicability of the Feres doctrine: military servicemen entitled to recover under Swine Flu Act); Overton v. United States, 619 F.2d 1299 (8th Cir. 1980) (damages); Sparks v. Wyeth Laboratories, 431 F.Supp. 411 (W.D.Okla.), aff'd per curiam, No. 77 1047 (10th Cir. 1978) [unpublished opinion] (constitutionality of the Swine Flu Act); Drais-

ma v. United States, 492 F.Supp. 1317 (W.D. Mich.1980) (damages); Lee v. United States, 499 F.Supp. 307 (E.D.Tenn.1980) (damages); Parham v. United States, 503 F.Supp. 70 (E.D. Tenn.1980) (causation); Hixenbaugh v. United States, 506 F.Supp. 461 (N.D.Ohio 1980) (causation); Heyman v. United States, 506 F.Supp. 1145 (S.D.Fla.1981) (causation); Lima v. United States, 508 F.Supp. 897 (D.Colo.1981) (causation); Gicas v. United States, 508 F.Supp. 217 (E.D.Wis.1981) (causation); Funston v. United States, 513 F.Supp. 1000 (M.D.Pa.1981) (damages); Terrell v. United States, 517 F.Supp. 374 (N.D.Tx.1981) (causation); Migliorini v. United States, 521 F.Supp. 121 (M.D. Fla.1981) (causation), Warner v. United States, 522 F.Supp. 87 (M.D.Fla.1981) (causation); Adleson v. United States, 523 F.Supp. 459 (N.D.Cal.1981) (causation).

ly, it alleges that if a causal relation is proven, plaintiff has not established any theory of recovery which would render defendant liable.

## I.

### PRELIMINARY STATEMENT

On October 18, 1976, plaintiff Verlin Unthank, age thirty-eight of Salt Lake City, Utah, received a swine flu vaccination administered pursuant to the National Swine Flu Immunization Program (Swine Flu Act) of 1976, Public Law 94–380; 42 U.S.C. § 247b(j)–(1). The program was designed to inoculate the country's adult population against the threat of a swine flu epidemic. On November 16, 1976, thirty days after her vaccination, plaintiff experienced a sudden onset of severe pain in her lower back, followed by tingling and numbness in her legs and torso. She was hospitalized and diagnosed as having a serious neurological disorder known as transverse myelitis. This disease rendered her extremely weak and immobile. She still has residual effects from transverse myelitis.

## II.

### SUMMARY OF HOLDING

To summarize what we have concluded, we note that Mrs. Unthank developed transverse myelitis as the proximate result of her swine flu inoculation. Additionally, she is entitled to recover damages from the federal government incurred as a result of that neurological disorder.

In so holding, we do not find the government negligent nor do we rely for plaintiff's recovery on any theory of tort liability. Instead, we are interpreting the Swine Flu Act consistent with its clear and discernible legislative history, the policy expressed by former Secretary of Health, Education and Welfare Joseph A. Califano, Jr., and the stated position of the Department of Justice in other swine flu litigation.

In our view, the intent of Congress in passing the Swine Flu Act, and the expressed policy of the Department of Health, Education and Welfare, support just compensation for a plaintiff whose malady was predictable under the state of medical science in 1976 and was proximately caused by the swine flu vaccine. Our holding rests on narrow grounds and applies only to those vaccinees who meet the requisites of proof stated herein.

A recommendation is also documented calling for implementation of a national program to compensate victims of other national immunization programs predicated on no fault principles.

The following constitutes the court's findings and conclusions on the issue of liability.

## III.

### PLAINTIFF'S MEDICAL HISTORY

Since injuries of a neurological nature are claimed, a detailed study of plaintiff's medical history is necessary.

Plaintiff is now forty-two years old. She is married and has two children. Prior to 1975 she was employed as a secretary and managed an apartment house. She is presently unemployed. Plaintiff testified that she was in extremely good health in the fall of 1976 but had experienced some health problems in the past.

In 1965 Mrs. Unthank suffered from peptic ulcers and the drug Aventyl was prescribed. She had periodic dizziness. Plaintiff was involved in an automobile accident in 1969 which required treatment for whiplash and pain in her head, right arm and neck. She was hospitalized again in 1970 for the surgical removal of a tumor from her right foot.

Plaintiff's testimony and medical records revealed other less severe medical problems prior to 1976. Although she experienced fatigue due to depression from 1970 to 1973, Mrs. Unthank testified that her energy level returned prior to November 1976. Her medical records indicate that she had fallen accidently on two occasions and sustained minor broken bones. Plaintiff first fell while she was in the mountains collecting rocks and the second fall occurred while she was carrying one of her children.

Other recitals in the medical records relevant to a neurological diagnosis include complaints in 1973 of instances of incoordination and weakness between 1969 and 1973. The medical records from 1973 to 1976 (time of her swine flu shot) indicate that plaintiff had no significant neurological disorders.

Several items in plaintiff's medical history were the subject of conflicting interpretation by doctors. In 1970 plaintiff complained of vertigo[3] to a family physician. The incident occurred the previous day. Plaintiff testified that she used the term "vertigo" to describe a light sensation on the top of her head. At trial, Charles M. Poser, M.D., a neurologist, testified that her complaint was not medically recognized as vertigo. He explained that vertigo involves a rotatory component and the patient feels that either she or her environment is spinning.

Another item of controversy in plaintiff's medical records was a reported incident of blurred vision in September 1976.[4] There are three separate reports of this single episode, each indicating that it lasted for a different period of time. One states four hours, another twelve hours, and the last report twenty-four hours. Plaintiff testified that the incident lasted for about forty-five minutes commencing when she awoke in the morning.

As noted, on October 18, 1976 plaintiff received a swine flu vaccination. She encountered no noticeable medical problems for the first thirty days. However, on the evening of November 16, 1976 plaintiff took a hot bath. Upon lifting herself from the bath tub she began experiencing a sharp pain in her lower back. She related that at first the pain felt like gas, but the intensity increased and the pains persisted. Within a few minutes Mrs. Unthank began experiencing numbness in her right leg which quickly spread to her left leg and torso. At about 10:15 p. m., when she called for the paramedics, she was unable to support herself on her right leg. By the time she arrived at the hospital, about 11:00 p. m., she could not walk, even with the help of two paramedics.

She remained hospitalized from November 17 to December 8, 1976. During that interval she was unable to walk without assistance and had no feeling in her legs. On December 8, 1976 she was transferred to the University of Utah Hospital for rehabilitation. She remained there until January 22, 1977.

Plaintiff still experiences weakness and has difficulty standing and walking. In addition, she has minimal sensation in the lower half of her body which presents problems when she walks in the dark. She suffers from bowel and bladder incontinence.

## IV.

## MALADIES INVOLVED

The primary issue in this case involves a determination of whether the swine flu vaccination was the proximate cause of the neurological disorder suffered by plaintiff. While plaintiff claims her illness is transverse myelitis, testimony indicates three conflicting medical diagnoses. In addition to transverse myelitis, other diagnoses are multiple sclerosis and spinal cord infarction. We expressly find that her illness is transverse myelitis. We reject differential diagnoses of multiple sclerosis and spinal cord infarction. A brief discussion of these three maladies is necessary.

### A. Transverse Myelitis

Transverse myelitis or myelopathy[5] has reference to internal processes in which a spinal cord lesion is produced. This lesion is

---

3. Vertigo is one of the many symptoms associated with multiple sclerosis. It is one of the government's contentions that Mrs. Unthank's transverse myelitis was a manifestation of a pre-existing multiple sclerosis. Multiple sclerosis is discussed in greater detail in Section IV B, *infra.*

4. Visual abnormalities are also a prominent symptom of multiple sclerosis.

5. The Court uses the terms transverse myelitis and transverse myelopathy interchangeably.

708

limited vertically to one or a few spinal segments, but extends horizontally across the spinal cord. It is defined as an inflammation of the spinal cord across a horizontal segment resulting in lesions in the white-matter of the spine in certain areas. Accordingly, transverse myelopathy is a term denoting functional disturbances and/or pathological changes in the brain. The term is often used to designate nonspecific lesions, in contrast to inflammatory lesions. *Dorland's Illustrated Medical Dictionary*, 24th edition (1965).

Transverse myelitis most frequently occurs in the mid thoracic or high thoracic segments of the spinal cord. The first symptom of neurologic involvement often consists either of diffuse tingling sensations in the lower extremities, a burning sensation in the girdle surrounding the affected spinal cord segment, or severe back pain. Plum and Olson, *Myelitis and Myelopathy*, Chapter 36 in CLINICAL NEUROPATHY (Baker & Baker, ed. 1973), p. 26.

At trial, Barry Arnason, M.D., a neurologist, defined transverse myelitis as follows:

Transverse Myelitis is less clearly delineated in medical terms, but really means a relatively rapid or sudden interference with the spinal cord function for which no evidence of obstruction is found, and is thought to be inflammatory in nature, and may or may not be associated with recovery. I realize this definition leaves something to be desired but the area is a murky one.[6] (Testimony of Dr. Aranson)

There are no laboratory tests which confirm the diagnosis of acute transverse myelitis. Therefore, clinical criteria must be relied upon for diagnosis. Plum and Olson, *supra*, at 26–27. Differentiation between a spontaneous case of myelopathy and an episode of myelitis resulting from multiple sclerosis may be impossible except by follow up examination. Previous or associated clinical evidence of neurologic disease disseminated in time and space strongly favors the diagnosis of multiple sclerosis. *Id.*

While less than half of the patients with acute transverse myelitis have a clear history of an antecedent event, it is believed that, regardless of such event, acute transverse myelitis represents an abnormal immune response, *Id.*, at 24, 26. An abnormal immune response, or autoimmune response, occurs where the body is challenged by an antigen such as a viral infection or vaccine. The antibodies produced in response to the antigen attack the myelin surrounding peripheral nerve fibers or in the central nervous system. The result is a reduction in, or loss of, function of the affected nerves.

### B. Multiple Sclerosis

Multiple sclerosis is a disease marked by sclerosis occurring in sporadic patches throughout the brain or spinal cord, or both. The term sclerosis denotes a hardening of the nervous system due to inflammation of nerve tissue. Multiple sclerosis is characterized by multiple lesions of the central nervous system. Poser, *The Diagnosis of Multiple Sclerosis*, M.S. Symposium (1980). Among its symptoms are weakness, incoordination, strong jerking movements of the arms and legs, scanning speech, numbness and tingling in the extremities, and increased fatigability. *Dorland's Illustrated Medical Dictionary, supra*. Vertigo is also a common symptom. (Testimony of Dr. Barry Arnason).

A crippling disease, multiple sclerosis causes periodic deterioration of the central nervous system leading to paralysis and sometimes death. The frequency and severity of the periods of deterioration tend to worsen during the course of the disease with concomitant worsening of the symptoms. An estimated 123,000 Americans suffer from multiple sclerosis. There are approximately 8,800 new cases reported each year.

There have been different sets of criteria established for a diagnosis of multiple scle-

6. Compare this with a definition of Guillain-Barre Syndrome (GBS).. *The Attorney's Dictionary of Medicine*, Schmidt (1978) defines GBS as "a neurological disorder of unknown cause due to a virus, sensitivity to a virus, or a perverse immunological reaction of the body to constituents of certain vaccines, resulting in allergic neuritis (inflammation of nerves) and the destruction of myelin (a fatty substance covering some nerve fibers."

rosis. The most oft-cited of these are by Schumacher, *et al*:[7]

(1) Onset must occur between the ages ten and fifty.

(2) There must be objective abnormalities on neurologic examination attributable to dysfunction of the nervous system.

(3) There must be evidence of involvement of two or more separate parts of the central nervous system on neurologic examination or by history.

(4) The objective neurologic evidence of central nervous system disease must indicate predominantly white-matter involvement, *i.e.*, fiber tract damage.

(5) The involvement of the neuraxis must have occurred temporally in one of the following patterns: (a) in two or more episodes of worsening, separated by a period of one month or more, each episode lasting at least 24 hours; or (b) in slow, stepwise progression of signs and symptoms over a period of at least six months.

(6) The patient's signs and symptoms must not be more logically attributed to some other disease by a physician competent in clinical neurology.

These symptoms are characteristically transient, lasting from minutes to weeks or months. Poser, *The Diagnosis of Multiple Sclerosis, supra.* The single most important criterion in diagnosing multiple sclerosis is the demonstration of more than one lesion of the spinal cord. *Id.* Multiple Sclerosis is often presented through an episode of transverse myelitis. (*See* excerpt of testimony of Dr. Arnason, *infra*).

The diagnosis of multiple sclerosis falls into three categories: (1) definite multiple sclerosis—the physician is certain that the patient has the disease [this diagnosis is usually made by autopsy]; (2) probable multiple sclerosis—the physician is reasonably certain that the patient has multiple sclerosis; and (3) possible multiple sclerosis (some likelihood of having the disease).

### C. Spinal Cord Infarction

A spinal cord infarction is an area of dead tissue surrounding the cord which results from an obstruction of circulation of blood to the area. *Dorland's, supra.* A spinal cord infarction is usually related to some form of vascular disease (Testimony of Dr. Matsuo, M.D., a neurologist).

Spinal cord infarctions are very rare, especially in younger people. Recovery from an infarction is uncommon and seldom complete (Testimony of Dr. Poser). Severe pain and sudden onset are characteristic of spinal cord infarctions. In addition, sensory loss is not usually associated with this disorder.

### V.

### EXPERT MEDICAL TESTIMONY

Primary medical testimony was presented by five neurologists who were qualified as expert witnesses:

Charles M. Poser, M.D., Professor of Neurology, Boston University;

Jack Petajan, M.D., Professor of Neurology, University of Utah;

Alvin J. Wirthlin, M.D., Neurologist, University of Utah;

Fumisuke Matsuo, M.D., Department of Neurology, University of Utah;

Barry G. W. Arnason, M.D., Professor and Chairman, Department of Neurology, University of Chicago.

Extensive medical literature[8] was also reviewed, including: Reik, *Disseminated*

---

7. Schumacher, *et al., Problems of Experimental Trials of Therapy in Multiple Sclerosis: Report by the Panel on the Evaluation of Experimental Trials of Therapy in Multiple Sclerosis*, 122 Annals of the New York Academy of Sciences 552 (1965).

8. In addition to the medical literature introduced in evidence, our research reflects several law review articles dealing with the effect of tort law on mass immunization programs. Morgenstern and White, *Guillain-Barre Syndrome Following Vaccination*, Law.Med.J. 9 2d, 465 (1981); Baynes, *Liability For Vaccine Related Injuries: Public Health Considerations and Some Reflections on the Swine Flu Experience*, 21 St. Louis L.J. 44 (1977); Franklin and Mais, *Tort Law and Mass Immunization Pro-*

*Vasculomyelinopathy*, 7 Annals of Neurology 291 (1980); Altrocchi, *Acute Transverse Myelopathy*, 9 Archives of Neurology 111 (1963); Lipton and Teasdall, *Acute Transverse Myelopathy in Adults*, 28 Arch. of Neurology 252, 1973; Ropper and Poskanzer, *The Prognosis of Acute and Subacute Transverse Myelitis Based on Early Signs and Symptoms*, 4 Annals of Neurology 51 (1978); and Plum and Olson, *Myelitis and Myelopathy*, Chapter 36 in 3 CLINICAL NEUROLOGY, (Baker & Baker, ed. 1973).

### A.

Drs. Poser[9] and Petajan testified that Mrs. Unthank suffered acute transverse myelitis as a result of the swine flu immunization. Both doctors reached this conclusion by ruling out other possibilities and based their opinions on a reasonable degree of medical certainty.

Dr. Poser conducted a neurologic examination of plaintiff which included taking a medical history independent of histories taken by other doctors. He concluded that she had transverse myelitis caused by an autoimmune response to an antigenic challenge, namely the swine flu vaccine. The rapid onset, course of plaintiff's disorder and negative findings of past neurological complaints were the primary benchmarks of his opinion.

In his differential diagnosis, Dr. Poser considered multiple sclerosis or a spinal cord infarction as possible causes of Mrs. Unthank's transverse myelitis. He ruled out a spinal cord infarction because of plaintiff's age and her recovery. He testified that spinal cord infarctions occur predominantly in older persons with recovery being rare and typically incomplete.

Dr. Poser eliminated multiple sclerosis because nothing in Mrs. Unthank's medical history indicated any central nervous system disturbances prior to 1976. Additionally, there had been no new neurological signs since that time.

Dr. Poser testified that none of the complaints detailed in plaintiff's medical records were neurological. He testified that the episode of blurry vision, which Mrs. Unthank related, can be attributed to the migraine headaches she endured. The episode of vertigo recounted in the records was not vertigo, in Dr. Poser's opinion, because no rotatory sensation was involved. This incident can be ascribed to the Aventyl Mrs. Unthank was taking for her ulcers or to her recurring earaches or upper respiratory infections.

Dr. Petajan[10] also conducted a neurologic examination of plaintiff and took her medical history. He testified that the swine flu vaccine was the most likely cause of Mrs. Unthank's transverse myelitis. In his opinion, plaintiff experienced a post-vaccination autoimmune response which caused the transverse myelitis. Dr. Petajan, however, admitted that there is no exact proof of causation in the instant case.

Dr. Petajan ruled out multiple sclerosis and a spinal cord infarction as causes of Mrs. Unthank's condition. He testified that the vaccine was the only viable identifiable cause of the transverse myelitis suffered by plaintiff.

*grams: Lessons From the Polio and Flu Episode*, 65 Cal.L.Rev. 754 (1977). *See also* Fielding, *Managing Public Health Risks: The Swine Flu Immunization Program Revisited*, 4 Am. J.Law & Med. 35 (1978): Shapo, *Swine Flu and Legal Policy*, 63 A.B.A.J. 51 (1977); Wecht, *Swine Flu Immunization Program, Scientific Venture or Political Folly*, 3 Am.J.Law & Med. 425 (1977); Neustadt and Fineberg, *The Swine Flu Affair*, published by United States Department of Health, Education and Welfare, (1978). *See generally*, 24 A.L.R. 467; 79 A.L.R.3d 301, dealing with tort liability of drug manufacturers in vaccine related drug production; 94 A.L. R.3d 748, failure to warn in use of vaccine.

9. Dr. Poser is a contributing author in neurology treatises and has authored numerous articles dealing with central and peripheral neuropathies. He also has considerable experience in multiple sclerosis. He was previously Professor and Chairman of the Department of Neurology at the University of Vermont.

10. Dr. Petajan runs a multiple sclerosis clinic. He sees between 200 and 300 patients annually with this disorder.

Dr. Petajan eliminated a spinal cord infarction in light of plaintiff's age, her relatively good health prior to the vaccination, the lack of vascular problems, and the loss of sensation experienced by Mrs. Unthank. In ruling out multiple sclerosis, Dr. Petajan found evidence of only one lesion. He testified that multiple lesions are required for an accurate diagnosis of multiple sclerosis. In addition, Dr. Petajan found no history of neurologic illness prior to 1976.

### B.

Dr. Wirthlin was Mrs. Unthank's treating neurologist while she was first hospitalized. He took an independent medical history and performed numerous neurological tests. He testified that Mrs. Unthank suffered an idiopathic[11] transverse myelitis. In his opinion, there is no single proven cause of transverse myelitis, although the swine flu vaccine may have been the cause in this case.

In Dr. Wirthlin's view, the episode of transverse myelitis places Mrs. Unthank in the "possible to probable" multiple sclerosis category. According to his medical records, her blurred vision lasted twenty-four hours. While he stated that some of the events in Mrs. Unthank's medical history appeared to be neurological in origin, they could also be explained by her severe depression between 1970 and 1973.

### C.

Dr. Matsuo, to whom Mrs. Unthank was referred in 1977, testified that she suffered an acute transverse myelitis as a result of a spinal cord infarction. He could neither connect nor disprove a relation between the transverse myelitis and the swine flu vaccine. In his opinion, the acute onset and severe pain were indicative of a spinal cord infarction. He testified that the neurological findings were consistent with this diagnosis and that plaintiff's age did not rule out an infarction.

In Dr. Matsuo's notes, plaintiff's episode of blurred vision lasted four hours. While he did not completely rule out multiple sclerosis, he stated that one episode of blurred vision would not support a diagnosis of multiple sclerosis.

### D.

Dr. Aranson[12] testified that, based on the medical records and his experience, plaintiff's transverse myelitis was caused by a pre-existing multiple sclerosis. He did not examine or interview plaintiff. In reaching his diagnosis of multiple sclerosis, Dr. Aranson pointed to the episodes of vertigo, blurred vision, increased falling, complaints of incoordination,[13] increased fatigability, and emotional disturbances, all of which were detailed in plaintiff's medical records.

He stated that multiple sclerosis patients can be expected to encounter an episode of transverse myelitis. In addition, he testified that the absence of further neurologic symptoms since 1976 does not rule out multiple sclerosis. In his experience, some multiple sclerosis patients have remained symptom-free twenty years. He noted, however, this time interval is highly irregular.

Dr. Arnason stated that if plaintiff did not suffer vertigo, his diagnosis might change. On cross examination, he admitted

---

11. Idiopathic refers to a spontaneous condition of unknown cause.

12. Dr. Arnason is the national chairman of the Research Grants Committee for Multiple Sclerosis. In addition he has published numerous articles pertaining to multiple sclerosis and has done experimental work in the field. He is a contributing author in neurology treatises and has authored numerous articles on neuropathies.

13. Other witnesses, particularly Dr. Poser, viewed the evidence differently and placed no neurologic importance on the several factual underpinnings of Dr. Arnason's opinion. Those underpinnings include: (a) The report of vertigo was called that by plaintiff to describe a light feeling on the top of her head. Dr. Poser stated that this use of vertigo is not the neurologic description. (b) That plaintiff contends the episode of blurred vision lasted no longer than forty-five minutes. (c) That the *increased falling* notation in the medical records referred to two isolated incidents, one in which she was rock gathering in the mountains and the other in which she was carrying a child.

that the most important factor in an accurate diagnosis of multiple sclerosis is a neurologic examination and a medical history. Dr. Arnason disagreed with some conclusions in the medical records he received. He did not feel Mrs. Unthank's medical history revealed an absence of neurological complaints. Nor did he agree with the final diagnosis of a progressive transverse myelitis. He did feel, however, that the medical records were complete and enabled him to make a competent diagnosis.

Dr. Arnason ruled out a spinal cord infarction as the cause of plaintiff's transverse myelitis. Mrs. Unthank's recovery was the primary factor in this conclusion since an infarction involves dead tissue and recovery is rare.

Finally, Dr. Arnason ruled out a relation between multiple sclerosis (or transverse myelitis) and the swine flu vaccine. In his view, there is no evidence linking the vaccine with either malady. Thus, Dr. Arnason felt that one is not entitled to conclude that transverse myelitis is caused by the swine flu vaccine. Dr. Arnason further testified that flu vaccines, in general, do not cause transverse myelitis. He did not consider the article by Wells, *A Neurological Note on Vaccinations Against Influenza*, Brit.Med.J. (Sept. 25, 1971), which reports such a connection, to be persuasive.[14]

The testimony of Dr. Arnason is illuminating as to the relationship between transverse myelitis and multiple sclerosis. He stated that he seriously considered a diagnosis of transverse myelitis. His recognition of the difficult diagnosis in this case is noteworthy as to causation. Excerpts of his testimony follow:

THE COURT: Is your diagnosis that Mrs. Unthank has multiple sclerosis?

THE WITNESS: Correct.

THE COURT: She does not have transverse myelitis?

THE WITNESS: ... no question she has a transverse myelitis, but the transverse myelitis is a symptom of her multiple sclerosis.

THE COURT: So it is a factor?

THE WITNESS: Oh, yes.

THE COURT: Could you have MS without having transverse myelitis?

THE WITNESS: Correct.

THE COURT: Could you have transverse myelitis without having the related MS?

THE WITNESS: Yes.

\* \* \* \* \* \*

THE WITNESS: ... Transverse myelitis is a symptom of multiple sclerosis and a relatively common one, but many patients with multiple sclerosis do not have a clearcut transverse myelitis, and sometimes transverse myelitis can arise in isolation and not be a symptom of multiple sclerosis.

There is a relationship, but it is not a necessary one.

\* \* \* \* \* \*

THE COURT: ... Do you feel that there is some involvement with transverse myelitis; ...

THE WITNESS: Correct.

THE COURT: In her case is this related to MS?

THE WITNESS: I believe so.

\* \* \* \* \* \*

THE COURT: *Do you think that reasonable credible minds, professionals in the field of neurology looking at the same history and workup, could conclude a diagnosis of transverse myelitis in this case?*

THE WITNESS: *No problem. I entertained it seriously myself.* (Emphasis added to question and answer)

THE COURT: Those are the two closest diagnoses?

THE WITNESS: Yes, the vascular thing I would think is less probable by far. But the two that would have to be seriously entertained are multiple sclerosis and transverse myelitis arising from

14. The *Wells* article recognizes that neurologically severe central nervous system reactions, like transverse myelitis, might be expected to occur after immunizations. One case history is reported where the patient developed transverse myelopathy 29 days after being vaccinated.

isolation, but there is all this history of earlier events, and that's why I am concluding that the transverse myelitis is part of her multiple sclerosis.

\* \* \* \* \* \*

THE WITNESS: Certainly I know of no relationship between multiple sclerosis and the Swine Flu vaccination, and such data as are available to me—I follow a lot of MS patients and pretty much know what's going on there—no one has any suggestion of that.

With regard to the transverse myelitis occurring in relation to the Swine Flu vaccination, I don't know of it being reported, and, inasmuch as it does occur, it does occur sporadically, I don't think someone is entitled to conclude an association on the basis of a single occurrence or even two or three. These could be clans. So I would have to say that I don't have a firm opinion with regard to any relation between Swine Flu and transverse myelitis, but that I don't know of any evidence to suggest such an association. (Testimony of Dr. Arnason).

## VI.

## CAUSATION

Differences of expert opinion exist as to whether there is a causal connection between the swine flu vaccine and plaintiff's transverse myelitis. At trial, experienced neurologists rendered opinions based upon a reasonable degree of medical certainty that lead to contrary results. We have endeavored to determine those opinions which represent the more probable state of events.

In so doing, we have examined the experience of each doctor as well as the foundation and rationale for their diagnoses. In addition, we have compared their factual bases with the evidence at trial. The presence or absence of personalized medical examinations and individual medical histories by the respective physicians, while not conclusive, is a consideration as to the weight of respective expert testimony.

We recognize that the disorders involved in this litigation are both inexact and variable. However, in our role as fact-finder we must render an exact and precise decision.

We find and conclude that plaintiff has proven by substantial evidence—exceeding a preponderance of the evidence—that the swine flu vaccine was the proximate cause of her transverse myelitis. We further find that plaintiff does not suffer from MS and was not afflicted by that disorder when she received her immunization in 1976.

As discussed earlier, several possible causes or etiologies of Mrs. Unthank's transverse myelitis were considered. Four of the five neurologists ruled out a spinal cord infarction as the cause. This was based on plaintiff's age and her degree of recovery. We are convinced that these factors positively rule out a diagnosis of a spinal cord infarction.

Of more heated controversy was whether Mrs. Unthank developed transverse myelitis as a manifestation of a pre-existing multiple sclerosis. While several doctors placed Mrs. Unthank in the possible to probable category of multiple sclerosis, several factors persuade us against this diagnosis.

First, we find that Mrs. Unthank did not suffer "vertigo" in its neurologically significant sense. This isolated incident was not evidence of a slowly progressive multiple sclerosis. Dr. Arnason testified that if Mrs. Unthank did not suffer an episode of vertigo his diagnosis might change.

Second, the occurrence of periods of dizziness, incoordination, blurred vision and fatigability in Mrs. Unthank's medical history are more readily explainable as non-neurological events. There was testimony that the dizziness and blurred vision were probably related to medication Mrs. Unthank was taking for migraine headaches, ulcers, or respiratory tract infections. The only significant evidence of incoordination appears on occasions where falls are not uncommon: climbing in the mountains and carrying a child.

Third, there was no testimony that Mrs. Unthank ever suffered from more than one lesion in her spinal cord. It is well documented that multiple sclerosis is a disease manifested in *multiple* lesions of the spinal cord. Thus, we conclude that Mrs. Unthank was not suffering from a pre-existing multiple sclerosis.

There are two reasons for our conclusion that plaintiff's transverse myelitis was caused by the swine flu vaccine. First, the process of reasoning by which Drs. Poser and Petajan supported their opinions persuades us that their opinions are entitled to greater weight. Both conducted a neurological examination of plaintiff as well as taking independent medical histories. They arrived at the swine flu vaccine as the cause of her transverse myelitis after ruling out all other possible etiologies. Second, the close temporal relation between the vaccination and onset of neurologic symptoms convinces us that the vaccine was in fact the proximate cause of those symptoms. The thirty-day interval between plaintiff's vaccination and the onset of her symptoms falls well within the ten week period in which the government concedes the vaccine may cause Guillain-Barre syndrome (GBS).[15]

Like GBS, many neurologists feel that transverse myelitis is an autoimmune reaction to an antigen challenge, resulting in the destruction of myelin in the nervous system. Although GBS involves the peripheral nervous system and transverse myelitis the central,[16] the mechanism by which demyelination occurs is thought to be the same. (See generally Poser, M.D.L. Depo., pp. 20–30). It is logical to conclude that the time factor for demyelination in transverse myelitis is likewise similar.

## VII.

### APPLICABLE LAW

■ Under the FTCA, the United States is liable "for injury . . . under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred." 28 U.S.C. § 1346(b). Typically, this has been interpreted to mean that the United States is only liable for the negligent conduct of its agents or employees acting within the scope of their employment. *Logue v. United States*, 412 U.S. 521, 93 S.Ct. 2215, 37 L.Ed.2d 121 (1973); *Dalehite v. United States*, 346 U.S. 15, 73 S.Ct. 956, 97 L.Ed. 1427 (1953). However, by virtue of the Swine Flu Act, 42 U.S.C. § 247b(k)(2)(A)(i), the United States may be held strictly liable for the acts or omissions of a program participant.

■ Under applicable Utah [17] law, plaintiff has the burden of proving by a preponderance of the evidence that the swine flu vaccine caused the transverse myelitis from which she suffers. *Kimiko Toma v. Utah Power and Light Co.*, 12 Utah 2d 278, 365 P.2d 788 (1961); *Moore v. Denver & Rio Grande Western Railroad Company*, 4 Utah 2d 255, 292 P.2d 849 (1956). As noted, we find that Mrs. Unthank has met this burden of proof. She has established by a preponderance of the evidence that her transverse myelitis was proximately caused by the swine flu vaccine.

## VIII.

### LIABILITY

Once causation is established, we must focus on the question of the liability of the

---

15. Current medical and statistical data place an outside limit of ten weeks for a causative nexus between vaccination and GBS. As we have stated before, we do not consider this a settled doctrine and do not hold so now. *Alvarez v. United States*, 495 F.Supp. 1188 (D.Colo.1980); *Lima v. United States*, 508 F.Supp. 897 (D.Colo. 1981).

16. The central nervous system consists of the brain, brain stem, and the spinal cord. The peripheral nervous system begins where the nerves leave the spinal column and extends throughout the body.

17. 28 U.S.C. § 1346(b) provides that the United States shall be liable to the same extent as a private person would be under the laws of the place where the act or omission occurred. Therefore, Utah law is the "applicable" law; the act took their place.

Parenthetically, the Swine Flu Act triggered lawsuits in nearly every state in the country. As a result, fifty diverse state laws on product liability, negligence, and informed consent are involved. There is no uniformity in these laws. The potential conflict between court rulings on similar medical facts is clearly apparent considering the difference in state laws.

United States government. The Swine Flu Act provides:

> [T]he liability of the United States arising out of the the act of omission of a program participant[18] may be based on any theory of liability that would govern an action against such program participant under the law of the place where the act or omission occurred, including negligence, strict liability in tort, and breach of warranty.

[42 U.S.C. § 247b(k)(2)(A)(i)]

■ However, with respect to a claim involving the adequacy of the informed consent form, a plaintiff is required to prove negligence in order to recover. This is because the formulation of the informed consent procedure was delegated solely to the United States government.[19] *See Bean v. United States*, 533 F.Supp. 567 (D.Colo. 1981); *cf. Dalehite v. United States*, 346 U.S. 15, 73 S.Ct. 956, 97 L.Ed. 1427 (1953).

### A.

In this case, plaintiff has attacked the informed consent procedure. She contends that the government was negligent in failing to adequately apprise her of the risk of serious injury which might result from the administration of the swine flu vaccine. She testified that had she been made aware of the possibility of serious neurologic injury she would not have consented to the inoculation.

At the trial, plaintiff introduced two exhibits which constituted the informed consent forms prepared by the Center for Disease Control and utilized by the State of Utah in administering the vaccine. The first form is simply an informational statement concerning swine flu and the swine flu vaccine. The second form contains additional information and a section entitled "Special Precautions", which states in pertinent part:

18. The United States is not itself a program participant, even where it performs functions similar or identical to those performed by a program participant. Stipulation and Final Pre-trial Order, Exhibit 10, *In re Swine Flu*

> As with any vaccine or drug, the possibility of severe or potentially fatal reactions exists. However, flu vaccine has rarely been associated with severe or fatal reactions. In some instances people receiving vaccine have had allergic reactions. (M.D.L. Doc. No. 460, Pl. Ex. D)

We reviewed this same informed consent form in *Bean v. United States, supra.* There we held the warning specifying that there was a possibility of severe or fatal reaction to the vaccine was sufficient under Colorado law to provide her with adequate information to make an informed decision as to whether she should be vaccinated. We perceive no appreciable difference between Colorado and Utah law on informed consent. *Compare Mallet v. Pirkey*, 171 Colo. 271, 466 P.2d 466 (1970); *Hamilton v. Hardy*, 37 Colo.App. 375, 549 P.2d 1099 (1976); *Nixdorf v. Hicken*, 612 P.2d 348 (Utah 1980).

As we stated in *Bean*, the inclusion of potential neurologic disorders resulting from the vaccine adds nothing to the knowledge that the vaccine may lead to "severe or potentially fatal reactions." Thus, the United States cannot be said to have been negligent in the utilization of the informed consent procedures required under the Swine Flu Act. *See Bean, supra.*

### B.

Mrs. Unthank also alleges strict liability and negligence as theories of recovery against the federal government.

■ She contends that the swine flu vaccine was rendered "unreasonably dangerous" because of an inadequate warning provided by the government or a program participant. She claims the government is strictly liable for failing to adequately warn her of the risk of developing transverse myelitis following immunization. Having held the informed consent form to be ade-

*Immunization Products Liability Litigation*, M.D.L. No. 330, Misc. No. 78–0040 (D.D.C. 1979).

19. 42 U.S.C. § 247b(j)(1)(F).

quate, we are constrained to uphold the adequacy of that same warning under a strict liability claim. As we noted, a specific warning that transverse myelitis may follow administration of the swine flu vaccine adds nothing to the warning of the "possibility of severe or potentially fatal reactions." Mrs. Unthank has not established entitlement to recovery on a theory of strict liability.

Apart from the informed consent procedure, Mrs. Unthank has alleged that the government was also negligent in the manufacture, use, distribution, promotion, and administration of the swine flu vaccine. In order to recover on this theory, she was required to prove the breach of a duty owed her which was the proximate cause of her transverse myelitis.

█ Mrs. Unthank was unable to produce any convincing evidence that her transverse myelitis was proximately caused by the negligence of the federal government or of a program participant. Thus, we reject this argument.

In essence, we find that injury to Mrs. Unthank occurred without fault.

## IX.

### CONGRESSIONAL INTENT—SWINE FLU ACT

█ The inability to prove negligence on the part of the government does not, in our view, preclude plaintiff from recovering against the federal government under the Swine Flu Act. As shown, plaintiff has established that her transverse myelitis was caused by the swine flu vaccination she received on October 18, 1976. Plaintiff should not be denied recovery against the federal government when it initiated the

swine flu program, ordered the vaccination prepared to its specifications, and actively distributed and promoted the use of the vaccine. We are convinced that any other ruling would be contrary to the purpose of the Swine Flu Act and the clear intent of Congress. A brief review of the Swine Flu Act and its legislative history supports this conclusion.

### A.

In early January, 1976, a minor outbreak of a new strain of influenza was cultured from soldiers at Fort Dix, New Jersey. The new strain—called swine flu because it is also found in pigs—produced an antibody in infected persons identical to that produced in people who developed influenza during a world-wide pandemic in 1918–1919. That pandemic resulted in approximately 450,000 deaths in the United States and between 20 and 30 million deaths worldwide. While it was impossible to determine if this new strain was the same as the 1918 influenza, there was justifiable alarm among health officials in the United States.

Upon the recommendation of Department of Health, Education and Welfare officers and numerous medical experts, then-President Gerald R. Ford proposed a national immunization program to Congress in March 1976. On April 15, 1976, President Ford signed a bill appropriating $135 million for the immediate development of such a program. The program was to achieve the unprecedented goal of immunizing every American, without regard to age.

By early June, 1976 that goal was in serious trouble. Perhaps fostered by earlier cases imposing liability on vaccine manufacturers during the polio immunizations in the 1960's,[20] the private insurance carriers of

---

20. In *Davis v. Wyeth Laboratories*, 399 F.2d 121 (9th Cir. 1968), the court held that the failure to warn consumers about risks involved in taking polio vaccine rendered the drug unfit in the sense that it was thereby rendered unreasonably dangerous. In *Reyes v. Wyeth Laboratories*, 498 F.2d 1264 (5th Cir.), *cert. denied*, 419 U.S. 1096, 95 S.Ct. 687, 42 L.Ed.2d 688 (1974), the holding *Davis* was somewhat broadened. *Reyes* did not involve a mass immuniza-

tion program. The court extended the duty to warn of possible risks of the drug to those who received it without individualized treatment. Both cases involve polio vaccine and, significantly, the suits were brought directly against the pharmaceutical manufacturers. No government encouragement or involvement—as in the instant case—was present.

Both *Davis* and *Reyes* broadened liability in favor of consumers of pharmaceuticals and ex-

the swine flu vaccine manufacturers either cancelled or greatly limited their liability coverage. The manufacturers in turn refused to sell their vaccine unless the federal government provided some form of liability protection.[21] Again at the urging of President Ford and after several weeks of Congressional hearings, legislation was introduced in Congress on August 2, 1976 creating the National Swine Flu Immunization Program. Among other things, the legislation relieved the vaccine manufacturers and all other program participants from primary liability and created an exclusive remedy against the United States for any injuries resulting from the immunization program.

With unparalleled haste,[22] the bill came before the Senate on August 10, 1976, without hearings or a committee report, and was passed in amended form. 122 Cong. Rec. 26639 (August 10, 1976). The bill was sent to the House of Representatives, and even though many members had neither seen nor read the legislation, was expeditiously passed that same day. *Id.* at 26817. President Ford signed the National Swine Flu Immunization Program of 1976 into law on August 12, 1976.

Between October 1, 1976 and December 10, 1976, over 40 million Americans—or one-third of the adult population of the United States—were vaccinated. This made the Swine Flu Act the largest vaccination program in history. In conjunction with the Swine Flu Act, the Department of Health, Education and Welfare conducted a surveillance program to evaluate illness temporally associated with influenza vaccination. By December 2, 1976, seven cases of GBS in two clusters had been reported. On December 16, 1976, based on data from four test states, the immunization program was suspended.[23]

An intensive investigation involving all 50 states turned up 61 cases of GBS.[24] While GBS was the focal point of the investigation, other neurologic syndromes were reported, including facial paralysis (26 cases); other unspecified neuritis (26 cases); encephalitis (18 cases); peripheral nerve disease (16 cases); brachial neuritis (9 cases); optic neuritis (8 cases); demyelinating disease (5 cases); and labyrinthitis (5 cases). Retailliau *et al, Illness After Influenza Vaccination Reported Through A Nationwide Surveillance System, 1976–77,* American Journal of Epidemiology (1980) p. 275.

History has demonstrated that no swine flu epidemic occurred during the winter of

---

tended bases for recovery beyond traditional tort theories. More recent expansion of the liability of drug manufacturers is seen in *Sindell v. Abbott Laboratories*, 26 Cal.3d 588, 163 Cal.Rptr. 132, 607 P.2d 924, *cert. denied*, 449 U.S. 912, 101 S.Ct. 286, 66 L.Ed.2d 140 (1980). [The California Supreme Court adopted a theory of "market share" liability to allow Mrs. Sindell to recover damages as a result of her cancer even though she was unable to identify the manufacturer of the DES taken by her mother some twenty years earlier]. It is noted that *Davis, Reyes,* and *Sindell* reflect the basis of strict liability: the allocation of risk where there has been no clear fault on either side, but the defendant was better able to bear the loss. The evolution of strict liability is detailed in legal treatises. *See* W. Prosser, *Law of Torts* 495 (4th ed. 1971).

21. An additional factor may have been the tremendous increase in the cost of product liability insurance. The cost of premiums for drug manufacturers rose 613 percent between 1971 and 1976 and 388 percent between 1974 and

1976. Interagency Task Force on Product Liability, *Final Report,* United States Department of Commerce, (October 31, 1977) pp. VI–16.

22. This urgency, and the possible causes for it, were also noted by Judge Luther Bohanon in *Sparks v. Wyeth Laboratories,* 431 F.Supp. 411 (W.D.Okl.) *aff'd per curiam,* No. 77–1407 (10th Cir. 1978).

23. The program was continued again in early 1977, but only to persons with a high risk of contracting swine flu.

24. GBS is the most common demyelinating disease of the peripheral nervous system. Because of its clinical features and possible auto-immune cause, GBS attracted considerable attention. Susceptibility to neurologic complications due to auto-immune responses was foreseeable in 1976, not only with GBS but also neurologic disorders such as transverse myelitis.

1976–77. As was expected, many people who received vaccinations incurred some type of illness, injury or adverse medical condition in a period relative to the vaccination. Numerous lawsuits were filed throughout the country [25] alleging the vaccine as the proximate cause of their illness.

Pursuant to 28 U.S.C. § 1407, all actions were consolidated by the Judicial Panel on Multidistrict Litigation on February 23, 1978 for coordinated pretrial procedures before the United States District Court in Washington, D.C.[26] During pretrial procedures before that court, the controversial but crucial official statement of then-Secretary of Health, Education and Welfare, Joseph A. Califano, Jr. was made.

Secretary Califano stated that with respect to those alleging GBS,[27] the government was adopting a new policy. Persons who contracted GBS from the swine flu vaccine, in order to receive federal compensation:

> [W]ill not need to prove negligence by Federal workers or others in the Swine Flu Program as required by Federal law and the law in many states. Instead claimants in most cases need to show only that they in fact developed Guillain-Barre as a result of a Swine Flu vaccination and suffered the alleged damage as a result of that condition. (Statement of Secretary Califano, June 20, 1978).

Secretary Califano set out two reasons for adoption of this policy:

> First, the informed consent form . . . did not warn individuals that there was a one in one hundred thousand risk that a person receiving a flu shot would contract Guillain-Barre and that one in every two million would die from the condition . . . Second, in the Swine Flu program, the Federal Government, in an unprecedented effort, actively urged millions of Americans to get flu vaccination shots and funded the nationwide campaign. Thus we have decided to provide *just compensation* for those who contracted Guillain-Barre as a result of the Swine Flu program rather than force many individuals to prove government negligence in protracted proceedings. (*Id*). (Emphasis added) [28]

The Justice Department had stated that this policy was "within the intent of the Swine Flu Act and its legislative history and was appropriate under the circumstances." (Statement of Mr. Califano reiterating the Department of Justice policy statement.)

With respect to GBS, the policy announced by Secretary Califano was an admirable attempt at risk distribution for injuries resulting from what was, in 1976, thought to be a critically important immunization program. In our view, the government acted with the highest degree of good faith during 1976 when it so actively promoted the swine flu program. We offer no judgment as to whether this massive effort was necessary. That issue is not before

---

**25.** Over one hundred cases have been filed in the federal judicial districts comprising the Tenth Circuit, *i.e.*, Colorado, Wyoming, New Mexico, Utah, Kansas and Oklahoma. By designation, we have presided over trials in these federal districts.

As of September 1, 1981 about 4,000 administrative claims had been filed, resulting in more than 1,500 suits in federal district courts throughout the country.

**26.** *See In re Swine Flu Immunization Products Liability Litigation*, 466 F.Supp. 244 (Jud.Pan. Mult.Lit.1978).

**27.** Mr. Califano stated that as of that date 1400 claims had been filed under the FTCA of which

439 of those involved allegations of damages from GBS.

**28.** The government's position with regard to GBS cases was incorporated into the Final Pretrial Order in the Swine Flu Litigation: "[T]he United States has stipulated that [GBS] can be caused by the vaccine in certain instances . . . . If the United States has stipulated that the plaintiff in fact developed [GBS] at any time, it will remain to be determined whether such injuries were in fact caused by the administration of the vaccine, but it will not be necessary for plaintiff to establish any theory of liability . . ." Stipulation and Final Pretrial Order, Paragraph IX, *In re Swine Flu Immunization Products Liability Litigation*, M.D.L. No. 330, Misc.No. 78–0040 (D.D.C.1979).

us.[29]  We do adjudicate, however, whether this plaintiff, whose transverse myelitis was caused by a swine flu vaccination, and who received that vaccination when she answered the urgent call of her government, is entitled to "just compensation" from her government.  We hold that she is.

It is significant that Mr. Califano pinpointed GBS for special treatment.  At least one medical article refers to Landry-Guillain-Barre syndrome (GBS) as an "all-embracing phrase" which includes a variety of neurologic syndromes, including transverse myelitis.  Leneman, *The Guillain-Barre Syndrome*, Archives of Internal Medicine, (August 1966) p. 140.  Because of the affinity between transverse myelitis and GBS noted in this authority, we could very well rest on the proposition that the transverse myelitis suffered by plaintiff is within the definition, classification, and umbrella of GBS.  Thus, there are several distinct persuasive reasons supporting our finding that plaintiff's claim falls within the ambit of the policy surrounding compensation for GBS without establishing a theory of liability.[30]

Our holding is not grounded solely on this consideration.  The legislative history of the Swine Flu Act is in complete accord with allowing plaintiff to recover for her transverse myelitis.  That history reveals a forceful indication that the Swine Flu Act was intended to afford recovery for valid injuries resulting from immunization.

### B.

There is significant legislative history from which to discern congressional intent in passing the Swine Flu Act.  As mentioned above, many people in the legislative arena felt we were confronted with a potential influenza epidemic warranting immediate action.  *See e.g.* 122 Cong.Rec. 26631 (remark of Senator Williams, August 10, 1976).  Because of this the Senate Appropriations Committee reported that "careful and indepth review [of the Swine Flu Act] was not possible."  S.Rep.No.94–1147;  94th Cong., 2nd Sess., *reprinted in* [1976] U.S.Code Cong. & Ad.News 1987.  The purpose of the Act clearly was to free the vaccine manufacturers from liability so that the swine flu vaccine could be distributed.  *See e.g.* 122 Cong.Rec. 26626, 26634 (remarks of Senators Javits and Kennedy, August 10, 1976).

By assuming the liability for injuries arising from the immunization program, Congress evinced an intent that all valid claims against the government be compensated.  Senator Harrison A. Williams, Jr. of New Jersey, noting that their action raised serious questions about the capability of private enterprise to play a significant role in America's public health programs, stated:

> This is pioneering in the sense, it has never been done before, but it is in response to an emergency.  That is the way the liability fixes upon the government, through the total class act, *for any misfortune that should follow, as defined, the administration of the inoculation and vaccine...* 192 Cong. Rec. 26632 (August 10, 1976) (emphasis added).

Congressman Paul G. Rogers of Florida elaborated on the role of the federal government:

> [W]e have asked the drug companies to produce this vaccine.  We have told them how to do it.  We have told them the dosage we want, what strength.  We gave them the specifications because we are the only buyers, the Government of the United States.  This is not the usual process of going out and selling.
>
> *But if someone is hurt, we think people ought to have a remedy.  Id.,* p. 26796 (emphasis added).

The greatest fear expressed by both the vaccine manufacturers and the federal government was that a mass immunization effort would produce many frivolous, merit-

---

**29.** Final Pretrial Order, Paragraph I, *In re Swine Flu Immunization Products Liability Litigation*, M.D.L. No. 330, Misc.No. 78–0040 (D.D. C.1979)

**30.** It should be noted that neither the definition of GBS, Mr. Califano's statement, nor the Final Pretrial Order delineate the standards for a diagnosis of GBS.

less lawsuits. *See* 122 Cong. Rec. 26795 (remarks of Congressmen Flowers and Moss, August 10, 1976). In fact, it was the potential cost of dealing with meritless lawsuits that caused private insurance companies to back out of the program. United States Comptroller General, *The Swine Flu Program: Unprecedented Venture in Preventive Medicine,* (G.P.O. 1977), p. 18. Thus, the Federal Tort Claims procedure was utilized by Congress to "provid[e] a mechanism to take care of suits without merit." 122 Cong. Rec. 26796 (remark of Congressman Rogers, August 10, 1976).[31]

It is clear that the legislative history negates any inference that Congress intended to set up an unpenetrable obstacle to recovery of a *valid* claim arising under the Act. Several additional reasons compel us to conclude that Mrs. Unthank is entitled to recover against the United States. These are the same two reasons set out by Secretary Califano in justifying the administration's policy with regard to GBS.

First, there was sufficient information prior to 1976 that a neurologic disorder such as traverse myelitis was a recognized risk with influenza vaccination. While we have held the informed consent form to be adequate, it did not specifically indicate to plaintiff this risk. Second, plaintiff was actively urged to incur this risk through an unparalleled effort of the federal government. We consider each of these points briefly.

In two reports issued by the Center for Disease Control, ("CDC") prepared for the Advisory Committee on Immunization Practices (ACIP), "transverse myelopathy" and "transverse myelitis" were listed as recorded neurologic reactions stemming from previous immunization programs in this and other countries. *See Information Summary Prepared by CDC for the ACIP and for Presentation at a Public Meeting held on June 21, 1976, at the National Institute of Health* (Hattwick, M.D.L. Depo., 191A); and *Influenza Data Summary Prepared for the ACIP, June 22, 1976* (Hattwick, M.D.L. Depo., p. 194A). In addition, several prominent doctors testified that transverse myelitis was a recognized risk of influenza vaccination prior to the 1976 swine flu program.

Asked what neurologic complications could reasonably be expected to follow vaccination, Dr. Michael A. W. Hattwick[32] stated:

> I think I said to those people interviewing me who said, "what did you expect?" I said I expected encephalopathy, polyneuritis, and transverse myelitis based on a literature review, and those are the three things I expected. (Hattwick, M.D.L. Depo., p. 249).

Following a similar question, Dr. Herbert H. Schaumberg[33] testified:

> My opinion is that were I asked to enumerate a list of conditions that might occur as a result of vaccination, I would put . . . transverse myelitis, and certainly allergic neuritis of the GBS type as things very high on the list, because they are amongst the most prominent of the known allergic complications of the nervous system to vaccines. (Schaumburg, M.D.L. Depo., p. 41).

Finally, Dr. Charles M. Poser[34] responded to the same question:

> I think that the only prediction that could have been made in a very general way that neurologic complications including GBS, encephalopathies, acute hemor-

---

**31.** Comments of Congressional members during debate are authoritative and should be given weight as we construe statutes. *See, e.g. NLRB v. Fruit & Vegetable Packers & Warehousemen, Local 760,* 377 U.S. 58, 84 S.Ct. 1063, 12 L.Ed.2d 129 (1964). *United States v. Oates,* 560 F.2d 45 (2d Cir. 1977); *Pan American World Airways, Inc. v. C.A.B.,* 380 F.2d 770 (2nd Cir.), *aff'd,* 391 U.S. 461, 88 S.Ct. 1715, 20 L.Ed.2d 748 (1968).

**32.** Dr. Hattwick was the director of the Vaccine Reaction Surveillance System created in August, 1976 to monitor the occurrence of adverse effects following swine flu immunization. Prior to this, Dr. Hattwick was the Chief Medical Advisor for the National Center for Health Statistics.

**33.** Dr. Schaumberg was a Professor of Neurology at the Albert Einstein College of Medicine.

**34.** See Note 9, *supra.*

rhagic leukoencephalopathies, transverse myelinopathies, papillederma, etc. (Poser, M.D.L. Depo., p. 53).

Early medical literature is also persuasive in reporting cases of transverse myelitis following various forms of vaccination. *See* Miller and Stanton, *Neurological Sequelae of Prophylactic Inoculation*, Quarterly Journal of Medicine, (January 1954); Poser, *Disseminated Vasculomyelinopathy*, ACTA Neurologica Scandinavica, Volume 45 (1969); Wells, *A Neurological Note on Vaccinations Against Influenza*, Brit.Med.J., (Sept. 25, 1971).

Considering all the above, transverse myelitis was no less an anticipated risk from influenza vaccination in early 1976 than GBS. Thus, Secretary Califano's first policy rationale should apply with equal force to a victim of transverse myelitis.

In the fall of 1976 the government embarked on a national health preventive program to vaccinate every man, woman and child against a predicted devastating epidemic similar to that of 1918–1919 that saw 450,000 Americans die. Nearly 40 million citizens responded to the call of the government to be immunized. Many, like plaintiff, relied on the government's assurances that the vaccine was both safe and necessary. Since the total immunization of 200 million Americans presented a practical impossibility, the success of the program depended on as many people as possible responding to a perceived civil and patriotic responsibility.

A barrage of overwhelming publicity emanating from the highest reaches of government implored every American to be immunized. The President of the United States, in an unprecedented move on national television, pleaded for positive response by the American people. Like a true soldier responding to the call of the Commander in Chief, plaintiff responded and was immunized. Like those who suffered GBS as a result of their inoculation, Mrs. Unthank made a sacrifice at the behest of her government for the benefit of public health in this country. Now, unlike those who suffered GBS, Mrs. Unthank is being denied compensation for an injury equally devastating.

We do not believe this to be the intent or the desire of Congress in passing the Swine Flu Act. It was with an intent that victims of the immunization program be compensated that Congress took the unprecedented action of assuming primary liability for injuries resulting from the program. For the same reason, the government's policy with regard to compensation in GBS cases was found to be within the intent of the Swine Flu Act and "appropriate under the circumstances." (*see* statement of Mr. Califano, *supra*.)

In our view, there is no perceivable difference between compensation for GBS and compensation for transverse myelitis proven to have been caused by the swine flu vaccine. Both are equally valid claims against the federal government and should be entitled to equal treatment. Only such treatment would be consistent with congressional intent and with the policy expressed by Mr. Califano.

Mrs. Unthank has not established negligence or strict liability on the part of the government. Yet, she is in no way responsible for her injuries.[34A] The fact remains that Mrs. Unthank incurred injuries as a proximate result of the government's immunization program. The spirit and tenor of the Swine Flu Act and its legislative history suggest a remedy. We are implementing that congressional imprimatur in granting Mrs. Unthank recovery.

### C.

An additional basis exists for allowing plaintiff to recover against the federal government. State and federal compensation programs have traditionally treated closely related diseases or disabilities, i.e. those disabilities which are medically equiv-

---

**34A.** We emphasize the point that if plaintiff was afflicted with GBS during a temporal time period after the swine flu shot, she would not have to establish negligence for recovery in damages.

alent to those expressly provided for by the compensation statute, the same.

A landmark state workmen's compensation case is *Whitehead v. Holston*, 205 Tenn. 326, 326 S.W.2d 482 (1959). The Tennessee Supreme Court determined that their workmen's compensation statute, which listed certain compensable occupational diseases, was broad enough to include diseases "closely related" to those listed. This philosophy has been enacted by regulation into the disability provisions of the Social Security Act.[35]

The fact that GBS alone was singled out by Secretary Califano does not justify differing treatment for other "closely related" disorders proven to have been caused by the swine flu vaccine. In fact, the persons who reviewed the CDC surveillance system after the swine flu program was halted warned against making too broad a generalization about the occurrence of non-GBS disorders:

> While the variety of illnesses reported following influenza vaccination in 1976 in itself argues against a causal connection between the vaccination and most illnesses, it presents a formidable obstacle for the identification of those few illnesses that could be associated with vaccination but have not as yet been identified.

Retailliau et al., *supra*, p. 277.

As we have said, transverse myelitis is closely related, in etiology and pathology, to GBS. Additionally, like GBS, transverse myelitis is a neurological disorder that was *expected* to occur following influenza vaccination. Utilizing the principle of *ejusdem generis* that appears in other health-related compensation programs, we find that plaintiff, who has proven by a preponderance of the evidence that her transverse myelitis was proximately caused by the swine flu vaccine, is entitled to compensation from the United States of America.

### D.

In so holding, we are mindful of the need to decide on the narrowest possible grounds.

Mrs. Unthank is entitled to compensation because she established by a preponderance of the evidence that her transverse myelitis was proximately caused by the swine flu vaccine.

Unique circumstances may require singular and, at times, expeditious treatment by the courts. The most recent example was the Iranian hostage crisis. Litigation in the United States by private individuals threatened the final resolution to the crisis. President Carter took action to suspend those claims and the United States Supreme Court was called upon for an immediate decision as to the validity of the President's action. Speaking for the Supreme Court in *Dames & Moore v. Regan, Secretary of Treasury*, 453 U.S. 654, 101 S.Ct. 2972, 69 L.Ed.2d 918 (1981), Justice Rehnquist said:

> [W]e stress that the expeditious treatment of the issues involved by all of the courts which have considered the President's actions makes us acutely aware of the necessity to rest decision on the narrowest possible ground capable of deciding the case. *Ashwander v. TVA*, 297 U.S. 288, 347 [56 S.Ct. 466, 483, 80 L.Ed. 688] (Brandeis, J., concurring). This does not mean that reasoned analysis may give way to judicial fiat. It does mean that the statement of Justice Jackson—that we decide difficult cases presented to us by virtue of our commissions, not our competence—is especially true here. We attempt to lay down no general "guidelines" covering other situations not involved here, and attempt to confine the opinion to the very questions necessary to decision of the case.

(101 S.Ct. at 2977).

The Swine Flu Immunization Program of 1976 presents a similarly unique situation. The plethora of litigation that arose as a result of the immunization program has dictated that the courts proceed with all diligence to fairly resolve valid claims. This treatment mandates that each case be

---

35. 20 C.F.R. § 404.1516 (1980). This regulation provides that disabilities which are "medically equivalent" to those listed in Appendix 1, Subpart P of the Social Security Regulations are compensable under the Act.

decided solely on its individual facts and circumstances. We adhere to this mandate in the present case. We attempt to set out no general "guide-lines" to be applied in subsequent cases. Instead, we confine this opinion to the specific questions presented herein.

This case is distinguishable from previous rulings of courts in the swine flu litigation denying compensation to those plaintiffs suffering from maladies other than GBS. With the exception of those few cases holding the informed consent form to be invalid, the government has prevailed on the issue of causation in the overwhelming number of non-GBS cases. *See, e.g. Montoya v. United States*, 533 F.Supp. 586 (D.Colo. November 19, 1981) (amyotrophic lateral sclerosis); *Widdell v. United States*, No. 79–4226 (D.Kan. November 3, 1981) (cold urticaria); *Herndon v. United States*, No. 80–195–A (E.D.Va. October 29, 1981) (brachial plexus neuropathy); *Terrell v. United States*, 517 F.Supp. 374 (N.D.Tx. 1981) (encephalomyelitis); *Baker v. United States*, No. 78–C–468 (E.D.Wis. March 27, 1981) (leukoencephalopathy); *Gicas v. United States*, 508 F.Supp. 217 (E.D.Wis.1981) (rheumatoid arthritis); and *Cikins v. United States*, No. 78–328–A (E.D.Va. June 16, 1980) (optic neuritis).

Causation continues to be the critical issue in these non-GBS cases.[36] Mrs. Unthank is entitled to recover because she has proven by a preponderance of the evidence that her transverse myelitis was proximately caused by the swine flu vaccine. Additionally, this case is distinguishable because Mrs. Unthank's neurological disorder was identified by persuasive medical authorities as a predictable and foreseeable risk of the swine flu immunization. Our holding in this case in no way lessens the burden on subsequent plaintiffs to prove the element of causation.

## X.

## NEED FOR A NATIONAL COMPENSATION PROGRAM

The National Immunization Work Group on Liability[37] reported in March of 1977 that the federal tort procedure utilized by the Swine Flu Act was "inappropriate for a long-term national policy." OASH, *Reports and Recommendations of the National Immunization Work Group on Liability*, p. 35 (March 11, 1977). Several persuasive reasons for this conclusion are given.

First, application of federal tort law requires proof of fault for all claims under the law of the state in which an alleged act or omission occurred. Not only does this place an "unwarranted" burden of proof on a claimant, it also subjects liability under the Swine Flu Act to potentially different standards and interpretations in the fifty states. *Id.* p. 37. This is inconsistent with the concept of a *national* immunization policy.

Second, the Work Group concluded that the tort procedure of the Swine Flu Act "perpetuates the disincentives to participate in immunization programs on the part of the general public." *Id.* p. 37. The enormous expense of protracted litigation[38] and a formidable burden of proof that could ultimately prevent recovery may reduce the willingness of the general public to continue to participate in voluntary immunization programs. We have already seen that ex-

---

**36.** The court notes the relatively few non-GBS cases where the plaintiffs have succeeded in proving their maladies were caused by the swine flu vaccine. *See e.g. Hasler v. United States*, 517 F.Supp. 1262 (E.D.Mich.1981) (rheumatoid arthritis).

**37.** Six National Immunization Work Groups were convened by action of the Office of the Assistant Secretary of Health (OASH) to solicit advice in formulating a national immunization policy. The Work Groups studied and reported on the following problems: production and supply, research and development, consent, liability, health information and public awareness, and policy.

**38.** By October of 1980 less than 20 percent of all lawsuits filed had been disposed of, including final judgment, dismissal or settlement. Conversely, of the 3,965 claims filed with the Department of Health and Human Services, only 138 were still pending. GAO, Human Resources Division, *Letter to Senator John A. Durkin*, January 14, 1981, p. 4–5.

panded and uncertain tort liability is an effective disincentive for insurance companies and drug manufacturers to participate in immunization programs. (*See* legislative history of Swine Flu Act, *supra.*)

A comprehensive compensation program for the unavoidable victims of immunizations is long overdue in this country. Other countries, most notably West Germany, Denmark and Japan, have established compensation programs to benefit citizens who suffer vaccine-related injuries. West Germany and Denmark provide compensation for any person who suffers a post-vaccinal injury as a result of an immunization ordered or recommended by government authorities.[39] Japan has compulsory vaccination against certain disease, including polio, rubella and influenza. Victims of compulsory vaccinations may request benefits from the head of the city, town, or village which has jurisdiction over him.[40]

The compensation programs in these countries are similar in design and function to our Social Security system and the various workmen's compensation statutes in the several states. Recovery is not tied to any concept of "fault".[41] The damages recoverable include medical treatment, death and funeral benefits, survivor benefits, rehabilitation expenses, and long term pension-type plans. None of these countries allow recovery of damages such as pain and suffering or punitive damages. Only West Germany has a statutory schedule to determine the amount of damages recoverable in a given situation.[42]

In both West Germany and Denmark, a reasonable probability of the causal relationship between the immunization and the injury is regarded as sufficient basis for recovery.[43] West Germany considers the statutory right to recover compensation for vaccine-related injury to be the expression of a constitutional principle that the individual who makes a sacrifice for the common good is entitled to compensation.[44]

The call for a no-fault compensation system enveloping America's immunization policies was heard prior to the swine flu program in 1976. *See* Ladimer, *Legal and Regulatory Perspectives in Mass Immunization Programs*, 643 Insurance Law Journal 459 (August 1976), and Krugman, *Immunization "Dyspractice": The Need For "No-Fault" Insurance*, 56 Pediatrics 159 (August 1975). In the past two years legislation has been introduced in Congress proposing the establishment of a "compensation commission" to solve some of the problems incurred in the swine flu litigation.[45] This commission would hear and determine claims

---

**39.** Federal Law on Communicable Diseases (Bundes-Seuchengesetz) of the Federal Republic of Germany, Section 51 (1961); Statute on Compensation For Damage Caused by Vaccinations, Danish Statute No. 82, Section 1, subsection 1 (1978).

**40.** Preventive Vaccination Law of 1948, Japanese Law No. 68 (1948). Compensation was first provided in 1976 amendment to this law.

**41.** In Japan a vaccinee may not be able to recover if he received a vaccination on his own volition from a private physician.

**42.** Federal Social Assistance Law of the Federal Republic of Germany is made applicable to the Federal Law on Communicable Diseases by sections 51 and 55 of the latter law.

**43.** Report of Panel of Review of Viral Vaccines and Rikettsial Vaccines, *Viral and Rickettsial Vaccines: Proposed Implementation of Efficacy Review*, Food and Drug Administration, 45 Fed. Reg. 225666 (April 15, 1980).

**44.** Schumacher and Myen, Bundes-Seuchengesetz [Federal Law on Communicable Diseases], p. 118 (Koln 1980): reporting the decision of the Bundesgerichtshof of February 19, 1953 (9 BGHZ 83). This concept was first expressed in sections 74 and 75 to the Introductory Law of the Prussian Code in the late 18th Century.

**45.** S. 2037, 96th Cong., 2nd Sess. (1981), and H.R. 511, 97th Cong., 1st Sess. (1980). These bills are currently awaiting action in the Senate Committee on Government Affairs and the House Judiciary Committee, respectively. More recently, the Radiation Compensation Act was introduced into the Senate. This visionary legislation, introduced by Senator Orrin Hatch of Utah, proposes compensation program for victims of radioactive fallout from the nuclear testing sites in Nevada. A rebuttable presumption that the government was at fault is written into the bill. Also pending in Congress is legislation which would provide compensation for some victims of crime.

against the United States by persons who contracted GBS from the swine flu vaccine. Compensation under these bills is provided for without regard to fault. No provision is made, however, for non-GBS illnesses proven to have been caused by the vaccine. This legislation is only a small beginning for a policy that is essential to the continued success of America's immunization programs.

Immunization against disease plays a significant role in this country's national health policies. Major reductions in morbidity and mortality since 1900, especially among children, have resulted primarily from preventive rather than curative approaches to disease control.[46] The Center for Disease Control has estimated that approximately 100 million doses of vaccines to prevent major communicable diseases are distributed annually in the United States.[47]

As pointed out in a Final Report to Congress by the Department of HEW:[48]

> While each vaccinee benefits from immunization, there is also a substantial benefit to the public at large. A child immunized against measles is protected against that disease; at the same time, he/she becomes a barrier to the spread of the disease, and the entire community benefits from reduction in transmission. Containment of disease and consequent reduction of morbidity and the complications of disease are the control objectives of immunization programs. Thus, the extent of public benefit depends upon the breadth of public participation. (HEW, *Liability Arising Out of Immunization Programs, Final Report to Congress*, May 1978, p. 4).

This appears particularly true when the public is asked to voluntarily respond to a perceived emergency situation, such as the expected swine flu epidemic in 1976.

Injury sustained by voluntary submission to inoculation can be construed to have been incurred in the public interest. The HEW report states that "the primary function of having a compensation system for emergency programs alone would be to encourage participation in an instance where large numbers of people must be inoculated quickly." (*Id.* p. 101).

HEW also sets out possible justifications for a compensation system:

1. Injured individuals have performed a service of benefit to society; since a program such as immunization should not be undertaken unless total benefits outweigh total costs, benefits derived should be sufficient to cover the costs to those who are injured.

2. Injury may occur without fault, so the traditional method for compensating the injured will not cover the full costs of the program.

3. By promoting or requiring immunization, government has intervened directly into individual lives, causing changes that otherwise would not have occurred. This is particularly true of mandatory programs. (*Id.*, pp. 99–100).

Each of these three justifications support compensation for swine flu vaccinees, like plaintiff, whose maladies are causally related to the immunization.

In addition to possible emergency programs, many states have laws mandating

---

46. A vaccine for diphtheria was first developed in 1925. Since pertussis vaccine was introduced in the 1940's, the now-familiar combination vaccine DPT (diphtheria-pertussis-tetanus) has been routinely given in the United States. Inactivated poliomyelitis vaccine came into general use in 1955, followed by live attenuated oral polio vaccine in 1961. The first live-virus for measles was licensed in 1963, followed by mumps in 1968, and rubella in 1969. These three vaccines are now available in a single multiple antigen product, MMR vaccine. *Immunization Against Disease*, HEW, Public Health Service, Center for Disease Control (1972).

47. HEW, *Final Report to Congress, Liability Arising Out of Immunization Programs* (May 1978).

48. Section 3 of the Swine Flu Act required the Secretary of the Department of Health, Education and Welfare to conduct a study of the "scope and extent of liability for personal injuries or death arising out of immunization programs and of alternative approaches to providing protection against such liability (including a compensation system) for such injuries." 42 U.S.C. § 247b(j)–(*l*).

certain immunizations before children may enter school. (HEW, *Final Report*, Table 1, p. 9a). To date, only California has passed legislation that provides for the creation of a fund to be used to compensate victims of their mandatory immunization program for school children. We are not convinced, however, that compensation is a matter solely of state concern.

The American Academy of Pediatrics, Task Force on Compensation For Vaccine-Related Injuries, states some compelling reasons for a national compensation policy in an April 1981 report:

> [T]he Task Force believes that immunization of children is in the *national* interest, and immunization programs that have been successful have been *national* programs. Moreover, Americans are a mobile society, but vaccinations are needed and required in all states. States have varied interests and fiscal capabilities, and uniformity of compensation would be difficult in 50 different states. Finally, the Center for Disease Control serves as a national center for reporting of adverse effects to vaccines, and would work well in a national compensation setting. American Academy of Pediatrics, Task Force on Compensation For Vaccine Related Injuries, *April, 1981 Report.* (Emphasis in original).

The Office of Technology Assessment of the United States Congress,[49] various National Immunization Work Groups,[50] the Department of Health and Human Services,[51] the National Academy of Sciences,[52] and the Food and Drug Administration[53] have all investigated the need for a national compensation policy. Most of these groups have propounded recommendations for a national compensation procedure.

While we do not endorse any particular recommendation, we feel that a broad-based compensation policy predicated on no-fault principles merits serious consideration. Similar programs have been investigated to insure compensation for victims of catastrophic accidents in government programs,[54] including nuclear accidents. Rosenthal et al., *Catastrophic Accidents in Government Programs*, National Security Industrial Association (1963).

So long as immunization plays a key role in our national health policy, unavoidable adverse reactions to vaccines will remain. Only an adequate no-fault compensation system can provide the necessary incentives to drug manufacturers, state and local health care facilities, and critically, the American public, to continue to actively participate in emergency immunization programs. Preventive public health programs are of vital importance to the nation's population. Immunization programs are less expensive in terms of money and illness than the unnecessary toll of human lives and well being brought about by the lack of such programs. However, persons who incur illness directly related to the immunization itself are entitled to recover compensation without the need to establish liability based on an elusive tort theory.

This field of national immunology cries out for a more expeditious and fairer way of determining legitimate claims and com-

**49.** Office of Technology Assessment ("OTA"), *Compensation For Vaccine-Related Injuries: A Technical Memorandum.* G.P.O. (November, 1980); OTA, *A Review of Selected Federal Vaccine and Immunization Policies.* G.P.O. (September 1979).

**50.** *Reports and Recommendations of the National Immunization Work Groups.* Submitted to the Office of the Assistant Secretary for Health, March 15, 1977.

**51.** HEW, *Liability Arising Out of Immunization Programs, Final Report to Congress*, May 1978.

**52.** Institute of Medicine, *Report of a Study & Evaluation of Poliomyelitis Vaccines*, National Academy of Sciences (April 1977).

**53.** Report of Panel of Review of Viral Vaccines and Rickettsial Vaccines, *Viral and Rickettsial Vaccines: Proposed Implementation of Efficacy Review*, Food and Drug Administration, 45 Fed.Reg. 25652 (April 15, 1980).

**54.** The President's Commission For the Study of Ethical Problems in Medicine and Biomedical and Behavioral Research is currently in the process of examining and reporting the problem of compensation for the victims of medical and scientific experimentation.

pensating victims of the vaccination. National legislation is necessary to achieve this objective lest a patchwork approach be taken by the individual states in their salutory efforts in providing essential immunization programs.[55]

## XI.

## CONCLUSION

In summary, we are reminded of the words of the late Honorable Learned Hand, a distinguished jurist:

> [T]he judge must always remember that he should go no further than he is sure the government would have gone, had it been faced with the case before him. If he is in doubt, he must stop, for he cannot tell that the conflicting interests in the society for which he speaks would not have come to a just result, even though he is sure that he knows what the just result should be. He is not to substitute even his just will for theirs; otherwise it would not be the common will which prevails, and to that extent the people would not govern. Dillard, *The Spirit of Liberty, Papers and Addresses of Learned Hand* (Alfred A. Knopf, New York 1974), p. 109.

Under circumstances such as are presented in this case:

> [A] judge is in a contradictory position; he is pulled by two opposite forces. On

the one hand he must not enforce whatever he thinks best; he must leave that to the common will expressed by the government. On the other, he must try as best he can to put into concrete form what that will is, not by slavishly following the words, but by trying honestly to say what was the underlying purpose expressed. *Id.*

Our ruling reflects the underlying purpose and intent of Congress in adopting the Swine Flu Act. The common will, as expressed in that Act, is to provide compensation to those plaintiffs who establish that their malady was proximately caused by the swine flu vaccine.

Absent our rationale in this case, a situation would exist where an injury was directly caused by governmental action, *i.e.*, national immunization, and a citizen would be without a remedy for that injury. Such a result lacks fairness and runs contrary to distinct and precise legislative intent. President Abraham Lincoln wisely stated that "it is as much the duty of government to render prompt justice against itself, in favor of citizens, as it is to administer the same, between private individuals."[56]

Lest this decision be given wider interpretation than intended, recovery in the instant action is explicitly based on these requisites of proof:[57]

**55.** The argument has been made in the "Agent Orange" products liability litigation that federal common law should apply. The contention is essentially that the health and safety of our military servicemen is of pressing national concern, which should not be subject to the variances of state law. We note with equal force, the same argument is justified in a national public immunization program. The United States Court of Appeals for the Second Circuit has rejected this argument in the "Agent Orange" cases and held that state law should apply. *In re "Agent Orange" Product Liability Litigation*, 635 F.2d 987 (2d Cir.), *cert. denied, sub nom., Chapman v. Dow Chemical Co.,* —— U.S. ——, 102 S.Ct. 980, 70 L.Ed.2d 116 (1981). See the excellent trial court opinion in the "Agent Orange" litigation: *In re "Agent Orange" Product Liability Litigation*, 506 F.Supp. 737 (E.D.N.Y.1979) George C. Pratt, J.

**56.** This quote is inscribed in the Courts Building, Court of Claims side, Lafayette Square, Washington, D.C.

**57.** Following Secretary of HEW Joseph Califano's policy statement on June 20, 1978 (Section IX A, supra.) Judge Gerhard Gesell requested the government to file a statement concerning litigation procedure in cases arising out of the Swine Flu Act. We note that concerning stipulation of liability and settlement of GBS cases, the government suggested criteria equally, if not less, stringent than the requisites we set out here. *See Statement of the United States Concerning Litigation Procedure in Cases Arising Out of the Swine Flu Program*, filed July 31, 1978, M.D.L. No. 330, Misc. No. 78–0040 D.D.C. 1978). The requisites set forth there include the following:

(1) Plaintiff or decedent received a vaccination against Swine Flu;

(a) causation between the immunization and the neurological disorder has been established by a preponderance of the credible medical and scientific evidence;

(b) discernible symptoms of the disorder occurred within a proximate period to the immunization, (here, 30 days);

(c) the injury to the vaccinee is severe and has been debilitating;

(d) In 1976 the neurological disorder—transverse myelitis was identified among medical authorities as being a predictable and foreseeable risk arising from the swine flu immunization program; and

(e) the patient did not have a pre-existing malady, for example, Guillain-Barre Syndrome or multiple sclerosis.

This ruling does not extend to any other central or peripheral nervous system disorder, nor does it extend to other vaccinees claiming they suffered transverse myelitis as a result of the immunization. Each case depends on individual factual histories, symptoms and diagnoses. For example, a diagnosis of transverse myelitis without the requisite proof of causation does not render the government liable.

In sum, we find and conclude that Verlin G. Unthank developed transverse myelitis and that the swine flu vaccine she received was the proximate cause of the disease. The clear intent of Congress and the United States Government is to compensate valid claims, i.e., those claims where it is proven that a claimant's injury was proximately caused by the swine flu vaccine. Accordingly, the United States Government is liable to Mrs. Unthank.

We commend the excellent scholarship, trial preparation and case presentation by Clark W. Sessions and Duane R. Smith, counsel for plaintiff, and Jeffrey Axelrad, Emilia DeMeo, Ronald L. Rencher and Lawrence J. Leigh, all counsel for defendant, in the representation of their respective clients. The advocacy of all counsel was of the highest order.

### ORDER

On the issue of liability, we find the issues joined in favor of plaintiff Verlin G. Unthank, and against the defendant, United States of America. Damages to be awarded Mrs. Unthank will be determined at a later hearing.

**UNITED STATES of America**

v.

**William C. SHERR, Defendant.**

**No. S 80 Crim. 0449 (KTD).**

United States District Court,
S. D. New York.

Jan. 5, 1982.

(2) Plaintiff or decedent filed a valid claim for administrative relief with the U.S. Public Health Service;

(3) Plaintiff or decedent must in fact have developed Guillain-Barre Syndrome subsequent to receipt of the swine flu vaccination;

(4) Plaintiff's or decedent's Guillain-Barre Syndrome must have resulted from administration of the swine flu vaccine; and

(5) Plaintiff must establish damages in accordance with applicable law.